ALBANY,
Feb. 1806.

The United
Insurance
Company
v.
Scott & Sea-
man.

## The United Insurance Company *against* Scott and Seaman.

The plaintiffs
were insurers
on the *cargo*
and *freight*,
and the defend-
ants with 22
others were
*separate* insur-
ers on the *ship*
on a voyage
from *New-
York* to *Sa-
vannah* and
from thence to
*Kingston* in
*Jamaica.*
The ship was
captured on
her voyage,
and carried in-
to *Porto Rico.*
Abandon-

THIS was an action of *assumpsit* for money paid, laid
out and expended by the plaintiffs for the defendants, and
for money had and received by the defendants to the
use of the plaintiffs. Plea *non assumpsit*. The cause
was tried at the *New-York* sittings, on the 5th of *July*
1803, before Mr. Justice *Livingston*, when a verdict was
found for the plaintiffs, subject to the opinion of the court,
on the following case.

The defendants and twenty-two others were separate
underwriters on a policy of insurance, dated the 2d *March*
1798, on the ship *Niagara*, to Messrs. *F. and P. Rhine-
lander*, the owners, on a voyage from *New-York* to *Savan-
nah*, in *Georgia*, and from thence to *Kingston*, in the island
of *Jamaica.* The ship was valued at $15,000, and the

ments were made to the insurers on the cargo and freight and to the *separate* underwriters
on the ship, which were accepted respectively, and the sums insured paid as for a total loss.
The ship was, afterwards, liberated, and proceeded to her port of destinaton, and there de-
livered her cargo, of which the master, and *S.* and *T.* at *K.* were joint *consignees*. The whole of
the net proceeds of the cargo were applied by them to defray the expense of the *necessary re-
pairs* of the ship and also for *arming* her, &c.    In an action against the defendants as part
owners of the ship for the net proceeds of the cargo so taken and applied for the repairs,
&c. it was held that after the abandonment and acceptance, the defendants were *separate-
ly* answerable, and not as *joint-partners* with the other insurers on the ship, for a propor-
tion of the net proceeds of the cargo, applied to the *necessary expenses* of repairing the ship,
but not for arming or increasing her complement of men : and the sum that they were to
pay was to bear the same proportion to the whole sum so applied, as the sum subscribed
by them to the policy, bears to the whole amount underwritten on the ship.

whole insured at 22 1-2 per cent. The *Niagara*, with her cargo, sailed about the 1st *June* 1798, on the voyage insured. The owners instructed the master to proceed to *Savannah*, there deliver his cargo, take in another and proceed to *Kingston*, and after landing that cargo there, to go to *Honduras* to procure a cargo of mahogany and logwood, and from thence proceed to *London.* The ship, having performed about two-thirds of her voyage was captured and carried into *Porto Rico*, the latter end of *June* 1798. The owners, after advice of the capture, abandoned the ship to the several underwriters, who accepted the abandonment, and about the 15th *June* 1799, paid the amount insured, as for a total loss. After their acceptance of the abandonment and payment of the loss, the insurers on the 15th *June* 1799, by writing, appointed *Richard Hartshorne*, their agent, and authorised him, to take such measures relative to their interests in the vessel insured, as he should think best.

The ship was liberated at *Porto Rico*, on the 22d *January*, 1799, and pursuing her voyage, arrived at *Jamaica*, the 10th *February* following. A part of the cargo had been sold by the master at *Porto Rico*, to liberate the ship ; the residue was delivered at *Jamaica*. The ship being leaky, was regularly surveyed and great repairs were found necessary to enable her to prosecute her voyage home. In whatever related to the survey, repairs, &c. at *Jamaica*, the master acted wholly by the advice of Messrs. *Steele* and *Thompson*, merchants at *Kingston*, to whom he was addressed by his letters of instruction ; and they, with the master, were joint consignees of the cargo. On the 22d *February*, the owners, before they had heard of the arrival of the ship at *Jamaica*, wrote a letter to the master highly approving his conduct, and advising him to return to *New-York* from *Jamaica*, with what freight he could procure, and that they had cancelled the original charter-party. During his stay at *Jamaica*, waiting for the repairs to be made, the master wrote several letters to his owners, under dates of the 13th and 25th *February*, the 11th and 29th *April*,

ALBANY,
Feb. 1806.

The United
Insurance
Company
v.
Scott & Seaman.

ALBANY,
Feb. 1806.

The United
Insurance
Company
v.
Scott & Sea-
man.

1799, in which he informed them, that he should proceed on the original voyage, pursuant to his instructions. These letters, on, or about, the 1st *November*, 1799, were delivered to the agent of the insurers.

The plaintiffs were insurers on the cargo valued at $5,000, and on the freight valued at $7,500, on both of which policies the plaintiffs paid a *total loss* on the 21st *November*, 1798, in consequence of an abandonment made to them by the assured. The *cargo thus insured* was sold at *Jamaica* for $9,727 and 65 cents, and the master, being destitute of funds, applied the whole proceeds, with the advice and approbation of Messrs. *Steel* and *Thompson*, the merchants, at *Jamaica*, to defray the expenses of repairs and disbursements, for the ship. With their advice and consent also, the master, on or about the 10th *April*, 1799, made a new charter-party with merchants of that place, for a voyage from *Jamaica* to *Honduras*, and from thence to *London*. The cargo taken on board, consisted of government stores and troops, for which he was to receive $2,000 freight to *Honduras*. A few days before the ship sailed from *Jamaica* to *Honduras*, the master received the letter of the 23d *February*, from the owners, in which they advised his returning to *New-York*; but having previously made the new charter-party, and the cargo being on board, he determined to prosecute the voyage. He, accordingly sailed from *Jamaica*, on or about the 1st *July*, 1799.

Messrs. *Steele* and *Thompson*, wrote to the owners at *New-York*, on the 7th *July*, informing them of the ship's sailing, of the new charter, at eight guineas per ton ; that for extra advances to enable the master to pay for the repairs and disbursements of the ship, they had taken a *bottomry bond* upon her for £2409, 7, 10, *Jamaica* currency, to be paid out of the freight at *London*, and they added, that *the master had certainly gone to no greater expense than could be avoided.* This letter, with the inclosed accounts of the sales of the cargo, and of the ship's disbursements, was delivered by the original owners, to the agent of the insurers, on or about the 10th *November*, 1799,

The master received no letter from any of the insurers or their agent, until after his arrival at *London*, and during his stay at *Jamaica*, he received but one letter, that of the 23d *February*, from the original owners of the ship. The disbursements of the ship at *Jamaica*, including repairs, commissions, &c. amounted to $17,717 and 52 cents, but no particular account of the repairs was stated. The expenses of the ship at *Jamaica* were increased, by arming her with sixteen guns, and augmenting the number of her crew from seventeen to thirty-nine men. The sum charged for repairs and fitting the ship for the voyage, under the new charter-party, exceeded the value of the ship at *New-York*, or the sum insured. The ship, after prosecuting her voyage to *Honduras*, sailed from thence and arrived at *London* the 29th *November*, 1799.

The present action was brought to recover from the defendants, as joint-owners of the ship with the other underwriters, the net proceeds of that part of the cargo insured, which was sold, amounting to $9727 and 65 cents. Separate suits were brought against the other underwriters. One of the insurers did not accept the abandonment, nor pay, and afterwards became a bankrupt. All the others accepted and paid, but some of them afterwards became bankrupt.

On the above facts, two questions were made for the consideration of the court. 1. Whether the plaintiffs can recover the whole of the net proceeds of the cargo, without oining the other underwriters on the ship with the defendants in the suit? 2. If not, can the plaintiffs recover of the defendants, their proportional part of the said proceeds? If so, how is this proportional part to be calculated? By the amount of the subscription of the defendants, or by what other rule?

The case was argued at the last term by *Riggs* and *Harison* for the plaintiffs, and *Pendleton* and *Hoffman* for the defendants.

The Judges now delivered their opinions.

ALBANY,
Feb. 1806.

The United
Insurance
Company
v.
Scott & Seaman.

ALBANY,
Feb. 1806.

The United
Insurance
Company
v.
Scott & Sea-
man.

THOMPSON, J. The principal questions arising out of this case, are, 1. Whether the defendants are answerable in the present action, and if so, 2. To what extent?

It cannot be controverted, that the underwriters upon the ship, after the abandonment and acceptance, became owners thereof, and answerable for all necessary repairs and expenses. The acceptance must, I think, have a retro-active effect, and the underwriters be deemed owners from the time the accident happened. They cannot, however, be considered joint-owners, so as to constitute them partners, or so as to make them responsible, one for the other. It certainly would not be pretended, that because they subscribed the same policy, they thereby became joint-partners; they are total strangers to each other; and, if being on the same policy would not constitute them partners, I connot see why accepting the abandonment, should make them such. If the loss happens by any of the perils insured against, the underwriters are bound to pay their subscription, whether they accept the abandonment, or not; and if the acceptance constitutes them partners, they are driven to the alternative of relinquishing the subject insured, or of becoming partners, and of course, responsible for whomsoever may be on the same policy. A doctrine leading to such consequences, never can be tolerated. By the acceptance of the abandonment, each underwriter must be deemed interested, individually, and not as a partner, in the proportion which his subscription bears to the value of the subject. Neither can the writing, appointing a common agent to manage the subject, have the effect of making the underwriters copartners. It is not uncommon for different persons to appoint the same agent to transact their business; but it would be a strange conclusion to say that the principals thereby became joint partners. In these cases, as well as in the one before us, the common agent must be considered as representing separately, the rights of each individual, according to his interest in the subject. I think, therefore, that the defendants are not to be considered joint-partners with the other underwriters, and that the action is maintainable against them in the present form.

· The next question is as to what extent they are responsi-
ble. Ship-owners are, undoubtedly, personally responsible
for necessaries furnished the master, in the course of the
voyage. The supplies, however, must be reasonable, fit,
and proper for the occasion. For the security of ship-owners
against being improperly charged by the master, it devolves
on the creditor to shew that his advances were for neces-
saries, because it does not fall within the scope of the mas-
ter's authority, or within the trust and duty of his station, to
pledge the credit of owners for any other purpose.—
The right of the master, *quasi* master, to appropriate the
cargo for the purpose of repairs, was, I think, at an end, on
the arrival of the ship at her port of destination. The cargo
then became subject to the controul of the consignees, and
the master must, if deficient in funds, resort to other sour-
ces for necessaries. In the present case, however, he, to-
gether with *Steele* and *Thompson*, were consignees of the
cargo, and as such, were agents for the plaintiffs, who by the
abandonment and acceptance, became owners of the cargo.
The plaintiffs' agents, then, appropriate the proceeds of
the cargo for repairs and expenses on the ship ; and though
this might have been unauthorised by the plaintiffs, and they
might have looked to their agents for compensation, yet
there is nothing to prevent their ratifying the acts of their
agents, and thereby making the advances their own, which
they have done by bringing the present action. The re-
sponsibility of the ship-owners, must, however, be restricted,
to advances for necessary repairs and expenses, to prose-
cute the voyage originally contemplated. They have done
nothing to ratify the expenses of the master at *Kingston*,
in arming the ship in the manner he did. None of the let-
ters written by the Messrs. *Rhinelanders*, or *Hartshone*, ap-
proving the conduct of the master, appear to have been
written after they were apprised of what course he had
pursued at *Kingston*. They had a right to presume he
was prosecuting the voyage according to his original in-
structions, which were very precise and definite. In viola-
tion of which, the master, at *Kingston*, fitted out this vessel as

ALBANY,
Feb. 1806.

The United
Insurance
Company
v.
Scott & Sea-
man.

ALBANY,
Feb. 1806.

The United
Insurance
Company
v.
Scott & Sea-
man.

an armed ship; put on board sixteen guns, and twenty-two additional seamen, and went to the enormous expense of upwards of seventeen thousand dollars which was more than the ship was valued at, in the policy. Such part of the expenses as related to this armament, were, I think, unauthorised. There is nothing in the case to show that any circumstances had occured rendering it necessary to arm; and it certainly was not in the contemplation of the original ship-owners, if we may judge from their instructions to the master. These expenses must therefore be rejected. The result of my opinion is, that the underwriters on the ship, are answerable for all repairs and expenses which were necessary to refit the ship, so as to enable her as a merchant vessel, to prosecute the original voyage; and that the defendants are liable in this action, for a proportion thereof, in the same *ratio*, as their interest in the ship bears to the proceeds of the cargo, applied to that object, which must be adjusted by the parties, or referred to some proper person for the purpose.

LIVINGSTON, J. If underwriters accept a vessel, it is reasonable that she should pass into their hands, *cum onere*, and that they should be liable for proper repairs in a foreign port, after the disaster which occasioned them, and subsequent to abandonment. Nor can it make any difference, whether an abandonment be immediately followed by acceptance or not. The party, ultimately benefited by the repairs, should pay for them. The underwriters were entitled to the freight made after abandonment, and we must now suppose, that without repairing, she was in no condition to have earned any. The captain, being the agent of the assured, might have borrowed money of the plaintiffs to repair, and if he has taken it of his own accord, or from the consignees of the cargo, it can make no difference, if they chuse to affirm his acts, and the monies have been properly expended.

My greatest difficulty has been, to define the extent of the defendants' responsibility; that is, whether they be liable as joint-partners, with the other underwriters, or only in proportion to their subscription. The case is admitted

to be new, at least no decision on the point can be found. We are then at liberty to adopt a rule, which we think best adapted to do complete justice between the parties. That owners of vessels are liable, as other joint-partners, is not denied, but then, as in other cases, it ought to be a partnership of mutual consent, and the world should credit them as such; but where a vessel, during a voyage, is thrown upon its insurers, who take it only for the purpose of diminishing a loss, and with no other view than to sell her at its termination, it is carrying the general principle too far, to consider them in the light of common partners; nor is it necessary for the security of third persons that they should be thus regarded. When monies are advanced in a foreign port for repairing a vessel, it is on the credit of the owner who sent her to sea, or of the captain, or of the vessel itself, or of all, and not on that of the underwriters, who are altogether unknown abroad. In this case, the monies were advanced partly on the credit of the Messrs. *Rhinelanders*, and partly on *bottomry*, and there can be but little doubt that, if ignorant of the abandonment, at the time of the advance, the lender might recover against them, who would have their remedy over against the underwriters, if it turned out that the repairs were made after abandonment. In the latter case, the underwriters would be responsible, according to their contract, that is, in proportion to their respective subscriptions; for the suit would then be between the immediate parties to the policy; why then, if the lender chuses in the first instance to resort to them, and not to the former owner, should the nature and extent of their liability be different? It is of little weight, to say, that assurers are not obliged to accept of a vessel; such acceptance is, generally, an act of necessity; it is the only means left to indemnify them, in some degree, for a total loss, and even this indemnity they will be deprived of, if it exposes them to the consequences of a partnership liability.

In voluntary partnerships, each one has a choice of his associates, but if a case like the present, be governed by the rules of common partnerships, a man of property, whether

ALBANY,
Feb. 1806.

The United
Insurance
Company
v.
Scott & Seaman.

ALBANY,
Feb. 1806.

The United
Insurance
Company
v.
Scott & Sea-
man.

he pleases or not, may find himself a partner with others who may all be insolvent, but himself. An underwriter, after subscribing a policy, has no controul over it. The assured presents it to whom he pleases, and precludes all possibility of choice as to his other partners; no prudent man on these terms would continue an assurer.

The extreme injustice of making a solvent pay for a bankrupt underwriter, where such liability is not explicitly understood in the first instance, is too evident to require illustration. It is an inconvenience, against which the policy itself has guarded, nor has such responsibility ever before been insisted on. Why should a man, who subscribes a policy for only one hundred dollars, without any view to purchase, pay, not only his own proportion of repairs, but also that of some adventurer, or gambler, who may have taken ten thousand dollars, after him, on the same risk, and who, at the very time was, perhaps, not worth a shilling? If, voluntarily, he had associated with such a man in the purchase, there would no longer be any hardship, because, knowing the law, he was apprized of the risk he ran and was willing to meet it.—" It is not enough," says *Watson*,[*] " to form a partnership, that two or more persons hold any " thing in common, such as *legatees*, *donees*, or *purchasers* " of the same thing, for this not implying the *reciprocal* " *choice* of the parties, cannot link them together in part- " nership. All the parties ought reciprocally to chuse and " approve of one another, in order to form among them- " selves, that sort of tie which is a kind of brotherhood;" *Societas jus quodamodo fraternitatis in se habet.* I concur therefore in the opinion just delivered.

<span style="margin-note">* Law of part-
nership, p. 5.</span>

, Kent, C J. By the accepted abandonment, the defendants became : t owners of the ship, and this ownership is to be compute from the time of the loss. Abandonment has this retrospe ve effect, and it amounts to a complete transfer of the property.[*] Whether the practice be to execute an *assignment* also, I do not know, though it seems not to have been done in the case of *Leatham* v. *Terry*, (3 *Bos.* & *Pull.* 479) until the underwriters themselves after-

<span style="margin-note">* 2 Caines, 284,
United Insur-
ance Company
v. Robinson &
Hartshorne.
2 Emerigon
194-6. Pothier
contrat d'assur-
ance, n. 138.</span>

wards sold the ship. The very essence of abandonment consists in a cession of the property, and being in writing, and accepted, the insurers are to be considered as the legal owners; and as they, afterwards, acted upon that cession, and took charge of the ship, they are, at least, concluded from contesting the question of ownership in the present suit.

ALBANY,
Feb. 1806.

The United
Insurance
Company
v.
Scott & Sea-
man.

The next question is, how far they are liable *as owners*, for the acts of the master while at *Jamaica?* The master may sell a part, or hypothecate the whole of the cargo, pending the voyage, and in a case of necessity; and for such sale the owner of the vessel will be responsible. But the present is not such a case, for the cargo had arrived, and except the small part, appropriated at *Porto Rico*, was delivered at *Jamaica*, its place of destination. The voyage as to the cargo had ended, and the master's authority over it, in his character of master, was gone. The cargo was, in judgment of law, in possession of the consignees, of whom the master was one. The sale of the cargo, afterwards, and the appropriation of the proceeds to the repairs and armament of the ship, was done by the captain and Messrs. *Steele* and *Thompson*, as joint-consignees, and no doubt they were responsible over to the plaintiffs for this appropriation, as for a breach of trust. But the master had authority to borrow money at *Kingston* for the necessary repairs of the ship, and the owners would have been bound to refund such loan. The question is, whether the plaintiffs, as owners of the cargo, may not *affirm* the act of their consignees, and call upon the owners of the vessel for the amount of such appropriation, in like manner as if they had themselves advanced the money in the first instance? A subsequent ratification is equal to an original mandate,* and I incline to think the plaintiffs have a right of action, equally as if the proceeds of the cargo had, by their order, been applied to the repairs of the ship.

* *Ratihabitio mandato comparatur. Dig. lib. 46. tit. 3. l. 12. § 46.*

The third point that arises in this case is, how far the repairs made at *Jamaica* were *necessary*, under the circumstances in which the vessel was placed? On this

ALBANY,
Feb. 1806.

The United
Insurance
Company
v.
Scott & Sea-
man.

point, I have no hesitation to exclude from the *item* of necessaries, the whole expenditure of arming the ship. There are no facts stated in the case, from which we can infer the necessity of doing it at *Jamaica*, and not in the first instance at *New-York*. The arming of the ship changed her charter, and was calculated to affect her destiny; and unless the necessity was palpable, and pressing, such an expenditure ought not to be allowed.

Deducting that part of the expense, and suffering the other charges to be admissible, the last question is, how far are the defendants responsible in consequence of their share in the ship? They insured *separately*, and the abandonment was made to them separately, because, it was made in the capacity in which they stood as insurers. They became owners of an *aliquot* part, in the *ratio* which their separate subscription bore to the whole sum insured, and it required a special *agreement* between the several insurers to change their separate character and make them joint-partners, and security for each other. Nothing can be more plain and reasonable, than that the character in which they started, should continue until changed by their act and consent. No such act appears in the present case. They accepted the abandonment in the capacity in which they stood as insurers. Their responsibility as owners was as distinct, as their responsibility as insurers. Their uniting in a letter to Mr. *Hartshorne* is no evidence of a co-partnership, or that they meant to engage for each other. They united only in making the same person agent for all. To make separate underwriters responsible for each other, and to adjudge them partners by mere operation of law, and in consequence of an abandonment which could not be resisted, would be destructive of that species of insurance. It would be manifestly unjust, for no person ought to be bound without his knowledge and assent. There is no color for an inference of that assent, in the present case. In the case of *Hoare* v. *Dawes* (*Doug.* 371) a broker was employed by a number of persons to purchase a lot of tea, of which

each were to have their separate shares, and he made the purchase. It was held that they were not partners in the tea, because there was no undertaking by one to advance money for another, nor any agreement to share with one another in the profit or loss. And Lord *Mansfield* observed, that it would be most dangerous, if the credit of a person who engages for a fortieth part, for instance, should be considered as bound for all the other parts. So in the case of *Coope and others v. Eyre and others* (1 *H. Blacks.* 37.) in which several persons entered into an agreement to purchase a quantity of oil in the name of A. only, and to take *aliquot* shares of the purchase, but as it did not appear that they were *jointly to resell* the goods, they were held not to be partners. There was no *community* between them as to profit or loss. Each party was to have a distinct share, and to manage it according to his discretion. The principle contained in these cases was adopted by this court in the case of *Holmes* v. *The United Insurance Company*, (*July Term* 1801) and they are applicable to the point before us. The true rule was applied by the court of chancery in the case of *Speering* v. *De Grave* (2 *Vern.* 643.) where it was decreed, that for appropriations by the master to the necessary wants of the ship, the owners should pay in proportion to their respective shares and interests in the ship.

The result of my opinion accordingly is, that the plaintiffs are entitled to receive from the defendants a proportion of the proceeds of the cargo applied to the refitting of the ship at *Kingston*, but not for what was applied towards arming the said ship, or increasing her complement of men; and that such proportion is to be the same between the sum they are to pay and the whole sum so applied, as there was between the sum the defendants subscribed and the whole amount of the subscription.

*Spencer*, J. and *Tompkins*, J. concurred in the opinions delivered by the other Judges.

Judgment for the plaintiffs, *ut supra.*