## The First National Bank of Marquette v. William Stewart.

*Charter party: Owner: Charterer: Carrier.* A charter party, whereby the charterer undertakes to man and equip the vessel at his sole expense, to use her for certain specified voyages, to load and unload her, to pay all the expenses of performing the voyages, provisioning or otherwise, to have the insurance extended, if it should expire before the voyages should be completed, at his own cost and risk, and finally to deliver up said vessel in as good condition as when received, except the natural wear and tear, is a hiring of the vessel; and the charterer, and not the owner, is the carrier, and assumes *pro hac vice* all the rights and obligations of owner.

*Charter party: Moneys borrowed by the master to save the vessel.* Under such a charter party, the owner is not liable, in the absence of any express authority to the master, for money borrowed by the master, on the occasion of the vessel's going ashore, to pay his men, so as to keep them to their duty in saving what he could from the wreck, and to return them to their homes; the loan was made in the interest, not of the owner, but of the charterer, upon whom rested the responsibility of paying the men and returning them home, as well as the burden of any loss from the wreck.

*Abandonment of wrecked vessel: Underwriters: Ratification: Res inter alios.* The fact that the owner had undertaken formally to abandon the wreck to the underwriters, had no force as a ratification of the acts of the master in borrowing the money, and could not in any way affect either the rights or liabilities

of the charterer; as to him, unless done with his consent, it was *res inter alios.*

*Abandonment: Relation: Possession: Expenses.* An abandonment relates back to the time of the disaster, and the underwriters are treated as in possession from that time, and any expenses incurred in endeavoring to save from the wreck, are considered as incurred in their behalf.

*Heard October 24. Decided October 29.*

Error to Wayne Circuit.

*A. Russell,* for plaintiff in error.

*Moore & Griffin,* for defendant in error.

COOLEY, J.

The plaintiff seeks to recover of the defendant the amount of certain moneys advanced to Captain Moore of the schooner Bermuda, which went ashore near Marquette, in November, 1869. The money was needed in order to pay the men and enable the master to save what he could from the schooner after being wrecked. The defendant was owner of the schooner, but on the ninth of the month she had been chartered to Eber Ward by the following instrument:

"It is this day mutually agreed between William Stewart, of the city of Detroit, Michigan, and owner of the schooner Bermuda, of the port of Detroit, burthen three hundred and ninety-four tons, old style, and Eber Ward, steamboat owner, of said place, as follows: That the said vessel, being now ready and fit for the voyage she is about to undertake, shall proceed as soon as possible, manned, equipped, at the sole expense of the said Ward, who is to have the use of said vessel for the purpose of making a voyage from Detroit to Marquette, on Lake Superior, taking thereto a cargo of supplies, thence to the port of Cleveland, Ohio, with a cargo of iron ore; said vessel not to be laden in a manner which shall render her unequal to the emergencies of the weather; said cargoes at either end of

the route to be put on board and taken out at the expense of said Ward, and all expenses attending the performance of the voyages also to be at the expense of the said Ward, provisioning or otherwise; that if said vessel shall be absent beyond the expiration of her insurance, said Ward is to have the same extended at his own expense and risk until she shall arrive at the port of Cleveland, where said vessel is to be delivered up to said owner in as good condition as when received, aside from the natural wear and tear, any damages by disaster or otherwise in the meantime happening to said vessel, to be repaired and made good by said Ward. For the use and charter of the aforesaid vessel, as above specified, the said Ward agrees to and shall pay to said Stewart, on or before the second (2d) day of December next, the sum of one thousand dollars ($1,000) lawful money. Witness our hands," etc.

Moore had been sailing the vessel for defendant under an employment for the season, and there was contradictory evidence upon the point whether defendant required Ward to take him on this trip. It is shown that Ward hired him at advanced pay, and that Moore engaged the crew at Ward's request. When apprised of the disaster, Stewart made a formal abandonment to the insurers. Moore, with the aid of the crew, succeeded in saving some three thousand dollars from the wreck, and with the money borrowed from the plaintiff, he paid the board of himself and crew while at work about the wreck, settled up with the men and paid their fare to Detroit, and afterwards, when he settled with Ward, paid over to the latter a small balance.

It is not claimed that there is evidence to show that Stewart had given the master any express authority to incur any liability on his account on this voyage; but it is insisted that he had such authority by the general maritime law. The point is, that by a legal construction of the

charter party, the charterer was to have the vessel of defendant ready, with master and crew provided by defendant, though to be paid by the charterer, and to use it for a particular voyage to carry specified cargoes belonging to the charterer, and consequently that the defendant was the carrier, executing through his agent, the master, an undertaking as such; that defendant let the use, that is, the whole tonnage of the vessel, ready and manned with her captain and mariners, and Ward engaged to furnish a cargo of supplies, and iron ore homeward.

Such a construction of the charter party is certainly not the obvious and natural one, and we are referred to no authorities, and have been able to find none, which would favor it. What defendant undertook to furnish was, a vessel "ready and fit for the voyage;" but if any implication could spring from these words, that master and mariners were included, it is negatived by the words which follow. The charter party expressly declares that she is to be .manned and equipped at the sole expense of Ward. Whatever may have been the understanding between Ward and defendant, as regards master and crew, it is unquestionable under this instrument that the charterer had a legal right to make his own selection, and if he yielded to any wish or demand of defendant in that regard, it was for some other reason than because the charter party required it. In no sense was defendant a carrier for Ward. He furnished a vessel for a specified compensation, which he was entitled to, whether any thing was carried or not; and Ward, during the voyage, had the exclusive possession and use, and having carried his own cargo, was to deliver up the vessel to defendant after the cargo had been discharged What Ward was to pay, was not for cargo carried, but for vessel hired; it was, consequently, not freight, or in the nature of freight; and the loss of the vessel did not affect

his liability to pay. As, therefore, defendant had no control of the vessel, or of its master and crew, and was only concerned in the compensation agreed upon, and in the safe return of his vessel at the conclusion of the return voyage, the conclusion would seem inevitable that his rights and obligations as owner, were *pro hac vice* superseded.

This conclusion is supported by the authorities. In *Parish v. Crawford, 2 Stra., 1251,* the foundation of an owner's liability is said to be "upon these two considerations: *First,* the benefit arising from the ship; which is the equitable motive; *Secondly,* the having of the direction of the persons who navigate it. And it is upon these two things, taken together, that the implied contract arises." In *Vallejo v. Wheeler, 1 Cowp., 143,* a deviation by the master, with the knowledge of the general owner, was held barratry with reference to a third person who had hired the ship, and who, consequently, was considered owner for the particular voyage. The same doctrine was recognized in *Taggard v. Loring, 16 Mass., 336.* In *Reynolds v. Toppan, 15 Mass., 370,* it is said, that to render a general owner liable for the contracts of the master, "it is not enough to prove that the vessel was owned by the defendant; it must appear also, that she was in his employment. It must likewise be proved that the master was appointed by the owner, and acted within the scope of his authority; for no one is answerable for the unauthorized acts and doings of another." It was therefore held in that case, that one who had hired the vessel, and himself employed and paid the mariners and the expenses of navigating the vessel, was to be deemed owner *pro hac vice*, though the compensation to the general owner was to be a certain proportion of the earnings. The question was considered in *McIntyre v. Bowne, 1 Johns., 239,* in which the correct doctrine is stated by Mr. Justice Thompson, as follows: "I apprehend

the distinction to be, that where, by the terms of the charter, the ship owner appoints the master and mariners, and retains the management and control of the vessel, the charter is rather to be considered a covenant to carry goods; but where the whole management is given over to the freighter, it is more properly a hiring of the vessel for the voyage, and in such case the hirer would be deemed owner *pro hac vice.*" And this distinction is also taken and enforced in the carefully considered case of *Pitkin v. Brainerd, 5 Conn., 451,* and in many other cases.—See *Houston v. Darling, 16 Me., 413; Cutler v. Winsor, 6 Pick., 335; Manter v. Holmes, 10 Met., 402; Gracie v. Palmer, 8 Wheat., 605; Hallett v. Columbian Ins. Co., 8 Johns., 272; Clarkson v. Edes, 4 Cow., 478.*

It is insisted, however, that even though this be so, the surrender by defendant to the underwriters was a ratification by defendant of all the acts of the master which had been done on his behalf and in his interest. Upon this it is to be observed, *first,* that, as already stated, there was no evidence in the case which would have justified the jury in finding that the loan was made by the master on defendant's account. On the contrary, all the evidence upon the point of express authority is, that none was given. If defendant can be held liable at all, it must be because the law implies an authority which he cannot dispute. But, *secondly,* we do not think the loan was made in his interest. It was made to enable the master to keep the men to their duty, and to return them to Detroit after they had saved what they could from the wreck. Now, the pay of the men and the responsibility for their return to Detroit was upon Ward, and the defendant was not concerned with the one or the other. The cargo was Ward's, and he had undertaken to deliver the vessel to defendant at Cleveland, in good condition, and to repair all damages in the mean

time happening to her by disaster or otherwise. Beyond this the defendant had the undertaking of the insurers for further security. Whatever was done towards saving cargo, must consequently have been in the interest of Ward, and whatever was saved from the furniture or equipments of the vessel, must have been in the interest either of Ward or of the underwriters, each of whom had assumed a liability for defendant's indemnity against such a disaster.

To epitomize the arrangement between Ward and defendant, as shown by the charter party, it appears in substance to have been this: Ward wanted the vessel for a voyage; defendant was willing he should have her, but for some reason,—perhaps because of the lateness of the season,—he would neither undertake to run her himself, nor would he take any liability, or incur any risk in respect to the proposed voyage. If Ward took her, he must agree to man and provision her, keep her insured, stand also as insurer for her himself, deliver her up safely after her cargo was discharged on the return trip, and pay a round sum for her use. These were the terms Ward accepted, and defendant could not be held liable without defeating his manifest purpose in requiring them.

But it is said that the abandonment by defendant to the underwriters, assumed that he had a possession to surrender, and consequently was a constructive acceptance of possession from Ward. But it is clear that that act could not affect either the rights or the liabilities of Ward. He had an undoubted right of possession which could not have been taken from him. If he had found it practicable to raise the ship and proceed with the voyage, it was his legal right to do so; and except with his consent, the abandonment was *res inter alios*. It is quite possible that the underwriters might have contested the validity of the abandonment; upon that we express no opinion; nor do we in any manner intend to

intimate what we may think regarding the respective rights and liabilities of Ward and the underwriters, as between themselves. In this case there was an abandonment by the general owner of the vessel, and an acceptance by the underwriters without obstacles being interposed by the charterer; and these facts are sufficient for the determination of the present suit.

Now, in case of an abandonment, the rule is, that it relates to the time of the disaster, and the underwriters are in possession from that time, and the expenses incurred in endeavoring to save from the wreck, are considered as incurred on their behalf.— *United Ins. Co. v. Robinson, 2 Caines, 280; Same v. Scott, 1 Johns., 106; Abbott on Shipping, 117,* and cases cited in note; *2 Pars. Mar. Law, 418,* and cases cited. It is evident, therefore, that an abandonment can raise no implication of a promise on the part of the insured, to pay for such expenses, where, by reason of their having been incurred on behalf of another person, he was not liable previously.

It results from what has been said that the judgment was correct, and it should be affirmed, with costs.

The other Justices concurred.