# SUPREME JUDICIAL COURT

#### FOR THE

## COUNTIES OF SUFFOLK AND NANTUCKET, MARCH TERM 1846, AT BOSTON.

PRESENT:

Hon. LEMUEL SHAW, Chief Justice.
Hon. SAMUEL S. WILDE, ⎫
Hon. CHARLES A. DEWEY, ⎬ Justices.
Hon. SAMUEL HUBBARD, ⎭

---

## WILLIAM W. CREASE & others *vs.* SAMUEL H. BABCOCK & others.

The provision in Rev. Sts. c. 100, § 22, that the court may allow amendments, either in form or substance, of any process, pleading or proceeding in a civil action, applies to suits in equity as well as at law, and authorizes the court to allow amendments of pleas to a bill in equity, which would not be allowable by the rules adopted by courts of equity as to the amendment of such pleas.

Under the Rev. Sts. c. 36, § 31, which provide that "the holders of stock in any bank, at the time when its charter shall expire, shall be liable, in their individual capacities, for the payment and redemption of all bills which may have been issued by said bank, and which shall remain unpaid, in proportion to the stock they may respectively hold at the dissolution of the charter," it was *held*, that the bill holders cannot severally maintain a bill in equity against the stockholders, to compel payment and redemption of the unpaid bills held by them respectively, but that all of them must join in one bill, or one or more of them must file a bill for the benefit of all, against all the stockholders.

*Held also*, that those who hold stock in a bank as collateral security are within the meaning of said section.

Crease & others *v.* Babcock & others.

*Held also,* that when part of the stock is owned by the bank itself, the individual stockholders are not, for that reason, liable to any further extent than they would have been if none of the stock had been so owned.

*Held also,* that holders of stock are not jointly responsible for each other, but that each is severally liable in such a sum, not exceeding the par value of his shares, as the amount of unpaid bills may require; and that the liability of solvent holders cannot be extended by reason of the insolvency of other holders.

*Held also,* that holders of stock are not liable to pay notes, called post notes, issued by the bank, payable on time and with interest; nor to pay interest on unpaid bank bills, either from the time when payment was demanded of the bank, or the time of filing a bill in equity to compel payment.

*Held also,* that the remedy against the individual stockholders is not confined to those who held the bills of the bank at the time when the charter expired, but extends to those who, after the charter expired, took the bills in the ordinary course of business, or otherwise acquired a good title to them.

*Held also,* that the terms "bills which shall remain unpaid" mean bills that shall be ultimately unpaid, after the application of the assets of the bank towards payment thereof, and that the holders of unpaid bills are not entitled to a decree for payment, against the individual stockholders, until after the assets of the bank have been so applied.

*Held also,* that an attachment of the property of the bank, made on a bill in equity (inserted in a writ) by the holders of unpaid bills against the individual stockholders, is wholly unavailing.

THIS was a bill in equity, originally brought by William W. Crease alone, dated April 28th 1837, and entered at November term 1837, against numerous stockholders of the Chelsea Bank, the charter of which was repealed by *St.* 1837, *c.* 225, to compel the defendants, under the Rev. Sts. *c.* 36, § 31, to pay certain bills, issued by said bank, which were unpaid when its charter was repealed, and of which said Crease was the holder. The bank was made a party to the original bill, which was inserted in a writ that directed an attachment of the defendants' property. Some of the defendants filed pleas to that bill, and some demurred thereto, on the ground that the repeal of the charter of the bank was unconstitutional and void. This demurrer was overruled in June 1839. (See 23 Pick. 334 – 346.) Those defendants who had pleaded then moved for leave to amend their pleas; and this motion was argued at November term 1839, by *C. G. Loring, Sprague & W. Gray,* for the defendants, and by *B. Rand & Derby,* for Crease.

The matter of the original pleas and of the proposed amendments sufficiently appears in the opinion of the court, delivered on the 30th of March 1840, by

WILDE, J. This was a bill brought against sundry stock-holders of the Chelsea Bank. At a former term, some of the defendants demurred to the bill, and the other defendants filed several pleas in bar. The demurrer was fully argued, and the argument on the pleas was opened on the part of the plaintiffs; but the reply of the defendants' counsel was postponed, by order of the court, until the questions raised by the demurrer should be determined. The defendants now move to amend their pleas, to which the plaintiff objects, on the ground that the motion was not seasonably made, and that the amendments are not allowable, according to the rules of courts of equity in this respect.

The rule of chancery seems to be, that when a party moves to amend his plea, he must show that the defect happened by mistake, how the mistake happened, and that the form of the amendments proposed, should be laid before the court, that the court may see whether it is material that the cause should be delayed for the purpose of admitting them. In *Newman* v. *Wallis*, 2 Bro. C. C. 147, the rule is thus laid down : " With respect to any amendment of the plea, though certainly there have been cases in which the court has permitted pleas to be amended, where there has been an evident slip or mistake, and the material ground of defence seemed to be sufficient, yet the court always expects to be told precisely, what the amendment is to be, and how the slip happened, before they allow the amendment to take place." The same rule is also laid down in *Wood* v. *Strickland*, 2 Ves. & Beames, 157, and in the modern treatises on chancery practice.

On examining the pleas, and the proposed amendments, and the affidavits of counsel, we are of opinion, that the defendants have substantially complied with the rule. The defects in the pleas were, that all the material averments in the bill, charging the defendants as stockholders, were not expressly denied in the pleas; that the pleas were argumentative, and that they were not supported by answers. For instance; in the plea of Babcock, he denies that he is a stockholder, and sets forth the facts in relation to his taking a certificate of

stock as collateral security; but he does not expressly deny
that he ever furnished, or paid in, or caused to be paid in, the
amount of the fifty shares which he held as collateral security;
and this defect he now moves to supply by an amendment,
and to strike out the word "thereupon," to avoid the objection
that the plea is argumentative, and to state, by way of answer,
in support of the plea, the same facts which are stated in the
plea itself. The amendments, therefore, are formal, and the
mistake was the mistake of the counsel who drew the plea;
and so it appears by the affidavit of the counsel, who testify
that the omission was by their inadvertence, and not from any
instructions of the said Babcock, or from any design to omit
said allegation, or to insert the said word "thereupon," and
that they did not suppose that any answer was necessary in
support of the plea.

It has been objected, that the defect in the pleas is sub-
stantial, and for that reason, the amendments ought not to be
allowed. But we are of opinion, that the substance of the
plea is sufficient, if it had been well pleaded. The main
question to be determined on these pleas is, whether the de-
fendants were stockholders in the bank at the time when its
charter was annulled. And if either of the defendants had
rested on a plea containing that simple denial, the plea would
have been substantially good. But in support of the plea, he
would be bound to answer all the averments in the bill relating
to that ground of defence; and if his answer admitted facts
which would show that he was a stockholder, the answer
would overrule the plea. Where a negative plea goes to
the foundation of the suit and the plaintiff's title, it is held
good; as, for example, where to a bill seeking an account of
partnership, a plea that the defendant was not a partner is a
good plea. And if this bill had only charged that the de-
fendants were stockholders at the time when the charter of
the bank was annulled, the proper plea would have been a
naked denial, or traverse of the fact that they were stock
holders; and such a plea would have required no answer to
support it. But if the bill charges, as it does in the present

case, any special matters, and seeks a discovery as to such matters, by which to establish the averment that the defendants were stockholders, the defendants are bound to answer as to the particular discovery, although they are protected from answer and discovery generally, as to the subject of the suit. This rule is laid down by Sir John Leach, in *Sanders* v. *King*, Mad. & Geld. 61, and *Thring* v. *Edgar*, 2 Sim. & Stu. 274 ; and in the former case he adds, " according to this rule, this plea, being unaccompanied by an answer and discovery as to the circumstances specially charged as evidence of the partnership, should be overruled ; but being a new case, the defendant must be at liberty to amend his plea." That case was very similar to the present, and the decision in that case shows that there are not any settled rules in chancery as to allowing amendments of pleas, or that they are not uniformly and rigidly observed. There are cases in which the defendant is held to deny the same facts, both in the plea and in the answer in support of it; as where the bill charges that a release was obtained by fraud, and alleges certain circumstances tending to prove the fraud, and seeks a discovery as to those circumstances. In such a case, it has been held that the defendant cannot plead the release alone, for that is admitted by the bill ; but he must deny that the release was obtained by fraud, and answer fully as to the circumstances. The rule of pleading, in such a case, appears to be left in some doubt by the authorities ; but the point is not material in the present case.

But if the amendments proposed did contain matters of substance, and so were not strictly within the rules of amendment adopted by courts of equity, we should nevertheless feel bound to allow the amendments. By the Rev. Sts. c. 100, § 22, the court in which any civil action is pending is authorized, at any time before judgment rendered therein, to allow amendments, either in form or substance, of any process, pleading or proceeding in such action. This provision as to allowing amendments in substance is a new provision, not contained in any previous statute allowing amendments, and it is applicable to suits in equity as well as at law.

It has been objected that the court is bound, by one of its established rules, (24 Pick. 419,) to follow the rules of chancery as to allowing amendments. The court thereby adopt, as the outlines of their practice, the practice of the high court of chancery in England, so far as the same is not repugnant to the constitution and laws of the Commonwealth, nor to the rules already adopted by this court, or such other rules as the court may from time to time make. Rules respecting amendments of pleas rather belong to rules of pleading than rules of practice, and are not strictly within the rule referred to. The court, however, do generally adopt the rule of pleading established by courts of equity. But in respect to amendments of the pleadings, in any stage of them, we rely on our own statutes, and rarely find much aid from the decisions of the English courts in this respect. In England, when the plaintiff in a suit in equity is allowed to amend his bill, he is held to pay a small sum as costs, although the amendment may become necessary by matters stated in the answer. But we have never allowed costs in such a case. An amendment, in such a case, is substituted for a replication, traversing the facts alleged, as was formerly allowed in equity pleadings, as well as in pleadings in courts of law. The rule in question adopts only the outlines of chancery practice, which supposes that it is not to be followed strictly in every particular, especially when the question relates to the provisions of our own laws. In this case, the courts of equity appear to have limited the allowance of amendments of pleas to matters of form ; whereas by the revised statutes the court is authorized to allow amendments in matters of substance.

As to the objection of delay, the defendants will be held to file the amendments forthwith, or in a very short time ; and this, we think, will cause no delay, but will expedite the decision of the case ; for probably the decision of the plea will put in issue all the material facts in dispute between the parties ; and if not, the facts stated in the plea and answer may as well be considered under the plea as after the defendants are held to answer in full. In either case, probably, the

Crease & others *v.* Babcock & others.

decision will depend on the same state of facts ; but however this may be, we think the amendments ought to be allowed.

---

After the foregoing opinion was delivered, the defendants demurred, *ore tenus,* to the plaintiff's bill, on the ground that all the bill holders should be made plaintiffs, or that one of them should file a bill for the benefit of all.   Other causes of demurrer were also assigned.

*Gardiner & F. C. Loring,* in support of the demurrer.

*B. Rand & Derby,* for Crease.

The opinion of the court was delivered April 11th, 1840.

WILDE J.   Several questions, as to the sufficiency of the pleadings in this case, have heretofore been decided ; and the principal question now remaining to be determined is, whether the bill be maintainable in the plaintiff's name alone, and for his sole benefit, or whether other parties should be joined, or the plaintiff should be held to prosecute for the benefit of all parties interested in the subject matter of the bill.

The general rule is, that all persons interested in the subject matter of a suit in equity, whether directly and immediately, or incidentally and remotely, are to be made parties, so that complete justice may be done between all parties interested, in one suit.   This is an important rule, as it avoids multiplicity of actions, and enables the court to do justice between persons having conflicting interests, and to avoid the injurious consequences that might follow from the decision of a cause, grounded on a partial consideration of its real merits. To this rule there are several exceptions, one of which is applicable to the present case.   In cases where parties are not all known, or are so numerous that it would be impracticable to join them without great delay and inconvenience, the court will dispense with the general rule, and allow one or more, having a common interest with others, to sue or defend for the benefit of the whole.   Thus a few creditors of a deceased debtor may maintain a suit against his representatives for an account of his assets, and the application of them to the payment of the demands of all the creditors.   So

where numerous persons have a common interest in a particular fund, one or more may sue for the benefit of the whole, for the purpose of obtaining a distribution of the fund. And in such cases, all the persons interested may come in, and prove their claims before the master, and thus entitle themselves to share, with the plaintiff or plaintiffs in the suit, in the benefit of the decree. Indeed, in such cases, they are really and substantially, though not nominally, parties to the suit.

This well established doctrine is admitted by the plaintiff's counsel, but they contend that it is not applicable to the present case, and that the rule and exception are limited to cases where several persons have a similar interest in a common fund, and to some other cases which it is not necessary now to advert to. We cannot, however, admit that the rule and exception are to be thus limited ; but we think the reason on which the doctrine is founded applies with great force to the case under consideration. If the bill holders may be allowed to maintain separate suits, some may recover payment of their demands in full, while other creditors, having claims equally equitable, may be unable to obtain any payment or satisfaction whatever.

It is true that it does not appear, on the face of the bill, that the stockholders are not liable and able to pay all the outstanding bills of the bank ; but the contrary does not appear, and cannot be ascertained until after the hearing of the case on its merits. The bill, however, alleges that the bank has become insolvent ; and it is to be presumed that there are many outstanding bills. So that, if such bill holder should be allowed to sue separately, it might subject the stockholders to such a multiplicity of suits, and such an accumulation of costs, as would be most vexatious and ruinous. This consideration alone is a sufficient objection to the bill, in its present form.

The case of *Hichens* v. *Congreve*, 4 Russell, 562, is similar in principle to this case. That was a bill by some shareholders in a joint stock company, (the stock of which was

divided into six thousand shares,) in behalf of all the share-holders, to compel the directors to refund moneys improperly withdrawn by them from the stock of the company, and applied to their own use. And the court held that, as all the shareholders had one common interest in the suit, the bill might well be sustained, and that to allow each shareholder to maintain a bill, to recover his proportion of the money, would produce enormous inconvenience and multiplied litigation.

But the plaintiff's counsel insist that the bill may be maintained without averring that the suit is brought for the benefit of other creditors or bill holders, and cases are cited, in which such bills have been allowed, in favor of a single creditor, against an executor. The case at bar, however, does not come within that exception to the general rule; and if it did, it would not be material. For, in the cases cited, the other creditors were allowed to come in and prove their claims, and share in the distribution of the assets; which reduces the question to a mere matter of form.

The last answer to the objection is, that the plaintiff has not a common right, title and interest with the other bill holders, but that he has obtained a priority, which authorizes him to proceed in the suit for his own sole benefit. But this argument, we think, cannot be maintained. For if he has no right to maintain a separate suit, he cannot acquire, by his attachment, a separate lien or priority. He has a priority over subsequent attaching creditors; but the lien is obtained for the benefit of all the creditors who may become interested in the judgment. The plaintiff ought to have sued for the benefit of all the bill holders, and cannot be entitled to any advantage arising from his own mistake.

The argument for the plaintiff, if carried out, would amount to this; that he had acquired a priority over the other bill holders, because he had brought an action for his own benefit, and had caused attachments to be made on the defendants' property, and thus had acquired a lien in his own favor; and that he had a right to maintain his suit, because he had thus

45 *

acquired a separate lien.   This would seem to be arguing in a circle, which can lead to no satisfactory conclusion.   The answer to the argument is, that the plaintiff cannot acquire an exclusive right or lien by the attachment, because he is not entitled to maintain the action for his own exclusive benefit. By the Rev. Sts. c. 36, § 31, the stockholders are made liable for the payment of all bills which remained unpaid at the time the charter of the bank expired; so that all the bill holders stood on the footing of perfect equality.

It is also the opinion of the court, not only that all the bill holders should be made plaintiffs, but also, that all the stockholders, who were such when the charter of the bank expired, should be made defendants.

The second objection to the bill is, that it is multifarious, being founded on §§ 30 and 31 of c. 36, of the revised statutes.   This objection is not material, as the plaintiff does not rely on § 30.   But the bill should be amended, by striking out that part of it which relates to that section.   That part of the bill cannot be considered as surplusage, whether the plaintiff can maintain the bill on that section, or not.   The defendants will be bound to answer that charge in the bill, whatever may be afterwards considered as the true construction of that section.

The last objection to the bill, namely, that another bill was pending for the same cause of action when the present bill was filed, cannot be maintained, because the fact does not appear by the bill.   If the fact is so, it should have been pleaded.

The first objection, however, being well founded, the demurrer must be allowed, unless the plaintiff moves to amend the bill.

———

There were other bills against the defendants, brought by single plaintiffs, which were like that originally filed by Crease. Each of them was inserted in a writ, and on some of them attachments were made of the property, not only of the alleged stockholders, but also of the Chelsea Bank.   After the foregoing opinion was delivered, all those bills were dis-

continued, and the plaintiff moved to amend his bill. The motion was granted, and the several plaintiffs united in one amended bill.

In the bill, as amended, William W. Crease, Stephen Barrett, jr. George Holden and Christopher Bryden, "in behalf of themselves and of all other holders of bank bills issued by the president, directors and company of the Chelsea Bank, which remain unpaid, who shall come in and contribute to the expense of this suit," set forth the incorporation of said bank by *St.* 1836, *c.* 274, and *its* powers, privileges, duties and liabilities, conferred and imposed by law; the issuing of certain (described) bills by said bank, which came into the hands of the several plaintiffs abovenamed, as lawful holders thereof; the demand on the bank, by the several plaintiffs, of payment of said bills, and the neglect and refusal of the bank to pay them; the failure of the bank on the 12th of April 1837, and the repeal of its charter, by the legislature, on the 19th of said April, by *St.* 1837, *c.* 225. This bill also set forth the number of shares in the capital stock of the bank, which were owned by the several defendants at the time when its charter expired by the repeal thereof, and alleged that notice had been given to the defendants of the refusal of the bank to pay its bills, and that the defendants were liable, by the Rev. Sts. *c.* 36, to pay the bills held by the plaintiffs and others.

It was alleged in the bill, as amended, that said corporation was organized and went into operation, on or about the 13th of October 1836; that at or before that time, John B. Glover was elected president, and William H. Guild cashier of said bank, and that they acted as such, until the repeal of its charter, and that this was known by the defendants; that the defendants, on said 13th of October, knew that said corporation was to go into operation, and that capital was to be raised and money or funds obtained, to be examined by the bank commissioners, in order to enable said bank to commence banking business; and that the defendants respectively agreed to furnish, and did, on or about the time aforesaid, furnish

such funds, money, checks, or other facilities to raise such funds, to the said Glover, the president of said corporation, or some other person or persons acting on behalf of said corporation, or authorized to act for them; that the defendants, respectively, and those acting for them, knew for what purpose the said money, checks, funds and other facilities were wanted and obtained by said Glover, or some one acting for said corporation, and that the same were paid and delivered to said Glover, or some one acting for said corporation, with such knowledge or belief of the purpose for which they were wanted, or were to be used; that the defendants received from said Glover, president as aforesaid, or from some other person, authorized to act for the said corporation, certificates of stock, signed by said Glover and Guild, or one of them, in their capacities of president and cashier, duly certifying that such defendants were absolute shareholders in said bank, and setting forth the number of shares held by each in the capital stock thereof; that the names of the defendants were entered as shareholders, and as original shareholders in the books of said bank; that they paid to the said president, or to some other person acting for said bank, on or about said 13th of October, the amount of their respective shares, in cash notes, checks or other facilities, which were payable to said bank, and that they were induced thus to pay in the same, and become shareholders, by encouragement received from said president, or other person or persons acting for said bank, that they should have loans, discounts and accommodations from said bank; that they aided and assisted in getting said bank into operation, served as directors, voted at the corporate meetings of said bank, gave proxies or authority to others to vote for them at such meetings, had discounts or a discount made for them, and accommodation given to them by the president and directors of said bank, and received a dividend on their said shares, or gave authority to some person or persons to receive a dividend; that the entries of their names upon the books of the bank gave a credit to said corporation, and that their names were inspected there by a committee of

the legislature, and induced said committee to make a report favorable to the credit of said corporation ; and that the defendants, to aid the credit of said corporation, assisted in circulating the bills thereof, and keeping some of them from being presented for payment.

It was further stated in the bill as amended, that some of the defendants pretended that they had transferred their shares aforesaid before the dissolution of the charter of said bank ; but the plaintiffs charged, that if it were so, yet the defendants made such transfers after or just before the dissolution of said charter, and after the defaults and insolvency of said bank, and with knowledge thereof, and after payment of the bank bills held by the plaintiffs had been demanded of them, and after they were apprised that suits would be brought against them, and for the express purpose of avoiding their just liabilities to the creditors of said corporation ; that such transfers were made without any consideration, without the knowledge, at the time they were made, of the assignees to whom they purported to be made, and were fraudulent and void : That some of the defendants pretended that they held said shares as collateral security for claims against said Glover ; but the plaintiffs charged the contrary to be true, and that the names of the defendants were entered on the books of said bank, not as trustees, but as absolute shareholders ; that the certificates thereof contained an absolute and unconditional declaration that the persons mentioned therein were shareholders, and set forth no trust or equitable interest for any other person or persons ; that there was no written declaration of trust, and that, if there were, it would not impair the liability of the defendants.

The prayer of the bill was, that the president, directors and company of the said bank, and the other defendants, be required to make full answers, on oath, to all the matters aforesaid.   There was also a prayer for a like answer to numerous specific interrogatories, embracing most of the allegations in the said bill.

To this amended bill, Samuel H. Babcock, one of the

defendants, not admitting any thing therein to be true, pleaded in bar, that he "was not, on the 20th of April 1837, nor at any other time, a stockholder or owner of any share or shares of the capital stock in said bank; and he avers, that he was not at any time a shareholder in said bank, and never held himself out to be such, nor acted as such, nor, to his knowledge, or with his consent, ever suffered himself to be so considered, and never knowingly or intentionally assisted in getting said bank into operation ; and that his name was never, to his knowledge, or by his procurement or consent, entered as an original stockholder, or as any stockholder, in the books of said bank ; and no entry of his name upon the books of said bank ever gave a credit to said corporation, to his knowledge, or by his procurement, or with his consent ; and that his name was never inspected, upon the books of said bank, by a committee of the legislature, to his knowledge, or by his procurement, or with his consent, and never, to his knowledge, or by his procurement, or with his consent, induced such committee to make a report favorable to the credit of said corporation."

This plea was sworn to, and also an answer, in aid and support thereof, which was in substance as follows :   That on or about the 13th of October 1836, John B. Glover was doing business as a merchant in Boston, and, as such, applied to said defendant for a temporary loan of $5000, but without proposing or tendering any collateral security for payment thereof ; that said defendant, wholly relying on said Glover's personal security, made and delivered to him a check on a bank in Boston for said sum, payable to the bearer; whereupon said Glover, without any request or expectation of the said defendant, delivered to him a paper purporting to be a certificate of fifty shares of the corporate stock of said bank, standing in the name of said defendant, and which said Glover intended should be kept by said defendant in trust and as collateral security for the repayment of said sum of $5000, on the return of said check:   That on or about the 20th of October 1836, Glover returned to him said check,

and the defendant tendered to him the said certificate of stock, and requested him to receive it ; but that he declined so to do, stating to the defendant that he wished to leave the same as collateral security for other sums of money which he then owed the defendant, and liabilities which the defendant was under for his account : That no stock in said bank was transferred to the defendant, by said Glover or any other person, at the banking house of the Chelsea Bank ; and yet, by the second section of the act incorporating said bank, it is enacted that " the stock in said bank shall be transferable only at its banking house, and in its books : " That the defendant was not a shareholder of the said corporation at the time of its failure and insolvency, or at any other time ; that he never subscribed for any shares, and had no knowledge of the election of said Glover as president, and said Guild as cashier, nor of their being so elected, except from common report, and seeing their names on the bills purporting to be issued by said bank, and in the certificate aforesaid ; that he did not know, and had not been informed, on or about said 13th day of October 1836, that said bank was about to go into operation, or that capital was to be raised, or funds obtained, to be examined by the bank commissioners, in order to enable said bank to commence banking business ; and that he was not informed and did not know for what purpose the check aforesaid, or the money to be obtained thereon, was wanted, or was obtained, or was used by said Glover ; and that said check was never, to the defendant's knowledge, passed to said bank, or to any person or persons : That the defendant did not receive said certificate as any evidence of title, except as collateral security as aforesaid, and did not know nor believe that it was intended to be, to him or any other persons, evidence of any other title than as collateral security, or that it gave him any right, title or claim to any stock therein mentioned, except to hold such stock as collateral security, as aforesaid : That the defendant's name was never, to his knowledge, or by his procurement or consent, entered in the books of said bank as

an original shareholder, or as any shareholder therein ; that he
never subscribed for nor agreed to purchase any shares there-
in ; that no transfer of any shares was ever made to him, at said
banking house of said bank, or in its books, to his knowledge,
or by his procurement or consent ; and no entry of any such
transfer to him was ever made, with his knowledge, procure-
ment or consent ; and that he never paid the amount of any
share or shares in said bank to the president thereof, or to
any person acting in its behalf, in cash, checks, notes or
other facilities, payable to said bank or otherwise :   That
he never acted as an officer or director of said bank ; never
was present or voted at any corporate meeting thereof, and
never gave any proxy or authority to any person or persons
to vote for him, and never had any discount made or accom-
modation given to him by said bank :   That he never heard
of more than one dividend declared on the shares mentioned
in the certificate aforesaid, while he held said certificate, and
that he had no knowledge of said dividend, at or about the
time it was declared, and did not assist thereto ; that he was
informed, a considerable length of time after said dividend
was made, that he could receive the sum declared due on the
said shares ; that he did receive it from the cashier of the
bank, about the 8th of April 1837, and immediately gave credit
therefor, on his books, to said Glover, who then owed him a
much greater sum ; and that, when he received said divi-
dend, he gave a receipt therefor to the cashier, by signing his
name in the proper column on the dividend sheet on which
his name was previously written in another column :   That
he did not, about the time of the failure and dissolution of
the bank, transfer any shares therein ; but, on the 10th of
February 1837, he transferred to said Glover, on the books
of the bank, the said fifty shares of said stock, the certificate
whereof was delivered to him by said Glover, as aforesaid ;
that this transfer was made after the failure and dissolution
of the bank, and after payment of its bills had been refused,
and suits to enforce payment had been commenced, and
while the books of the bank were in the hands of persons

appointed by the stockholders to be receivers and holders of its goods and effects, and when said bank had no banking house ; but that this transfer was not made with intent to avoid such legal liability, if any, as the defendant was already subjected to, nor without consideration, nor without the knowledge or consent of said Glover ; that the consideration of the delivery of said certificate to the defendant was the loan aforesaid of $5000, which was repaid, and that the defendant was requested by said Glover to retain the certificate as collateral security for other debts; but said shares had become worthless, and the defendant, having no wish to retain them, transferred them to said Glover, at his special request, as the person to whom they rightfully belonged ; which was a good and valuable consideration for such transfer.

A plea like that of Babcock, and an answer, which, in most particulars, was like his, were filed by Cutler and Penniman.

The firm of J. C. Howe & Co. pleaded a similar plea, and filed an answer, in which they stated that John B. Glover was indebted to them, on the 13th of October 1836, in the sum of $3612, for merchandize, and on that day, without their request or expectation, delivered to them a certificate of thirty shares of the capital stock of said bank, which he requested them to keep as collateral security for the payment of the sum aforesaid, and for no other purpose ; that they received a dividend on said shares on the 4th of April 1837, and immediately applied it to the credit of said Glover, on their books ; and that they, on the 15th of said April, before the dissolution of the charter of the bank, transferred said shares to said Glover, without any knowledge or information that any suit had been or was about to be commenced.

The other parts of the answer of these defendants were like the foregoing answer of Babcock.

Field & Gould filed a plea, alleging that on the 15th of October 1836, Stephen H. Cleveland borrowed of them

$2000, for which he gave them his note payable in six months, and caused to be transferred to them thirty shares of the stock of Chelsea Bank, as collateral security, and they gave him an obligation to transfer said shares to him, on his paying them said sum so borrowed of them; that they never received any dividend on said shares, nor authorized any person to receive one for them; that said Cleveland, on the 18th of April 1837, gave them other security for said $2000, and they retransferred to him all their right and interest in said shares; that they never subscribed for any of the said stock, nor paid in the amount of any share or shares thereof; that their names were never entered in the books of said corporation as absolute stockholders, to their knowledge, or with their consent; and that they never held themselves out as absolute stockholders in said corporation, nor as in any wise responsible for its debts, or otherwise. They therefore denied that they ever were stockholders in said corporation, r liable for its debts, and prayed that the bill might be dismissed as to them.

These defendants also filed an answer, which was in most respects like that of Babcock and of J. C. Howe & Co.

Dyer & Blake pleaded, "that on or about the 13th of October 1836, John B. Glover assigned and transferred to them thirty shares in the capital stock of Chelsea Bank, without their previous knowledge or consent; that they held the same for some time, being creditors of said Glover; that on the 15th of April 1837, they being embarrassed in their business, and making arrangements to stop payment, did assign and transfer back to said Glover the same thirty shares which they had received from him; that they never intended to hold said stock, except as collateral security to a demand against said Glover, and not wishing to continue to hold the same, they did, on said 15th of April, assign and transfer, as aforesaid, the same to said Glover; and they stopped payment on the 19th of said April, and were then, and are still, insolvent and entirely unable to pay their own proper debts; all which matters and things they aver to be

true, and plead the same to the whole of said amended bill or to so much thereof as seeks relief from them, and humbly demand the judgment of the court whether they ought to be compelled to make any answer to the said bill ; and pray to be hence dismissed, with their reasonable costs."

Several other defendants filed pleas, and some of them also filed answers in support thereof ; but no facts were alleged, either in the pleas or answers, which materially varied from those in one or the other of the pleas and answers above mentioned.

At March term 1841, the plaintiffs moved that the pleas of the several defendants should be overruled. This motion was argued by *B. Rand, Bartlett & Derby,* for the plaintiffs, and by *J. Pickering, C. G. Loring, B. Sumner & W. Gray,* for the several defendants.

The opinion of the court was delivered on the 19th of June 1841, by

SHAW, C. J. As the bill now stands amended, by which all the bill holders having similar demands have united in one suit, the several suits having been discontinued, it is a suit to charge the defendants, as persons who were stockholders in the Chelsea Bank at the time it was dissolved by the repeal of its charter. The liability thus sought to be enforced depends on the provisions of Rev. Sts. *c.* 36, § 31, of the following tenor : " The holders of stock in any bank, at the time when its charter shall expire, shall be liable in their individual capacities, for the payment and redemption of all bills which may have been issued by said bank, and which shall remain unpaid, in proportion to the stock they may respectively hold at the dissolution of the charter."

To this bill several of the respondents have pleaded, and rely upon their pleas as an entire bar to the plaintiffs' demand. A plea in equity is a well established mode of defence, and is very useful in a suitable case, where the defence depends upon a single fact or point, the establishment of which answers the whole equity of the bill, and thus tends to shorten the proceeding. It is more particularly

beneficial when the defendant pleads some single fact, which may be traversed and put in issue, and tried by evidence not depending upon the defendant's answer by way of discovery. But when the plaintiff, anticipating such defence, avers facts in his bill, which, if true, would tend to avoid the effect of the defendant's defence, and requires an answer from the defendant to interrogatories on oath — which he has a right to do — then the defendant, in addition to and in support of his plea, must put in an answer to all such interrogatories. At the same time, he is prohibited from answering the general equity of the bill, and such general answer would overrule his plea. This renders a plea a matter of much nicety and difficulty, when a pure and single plea is not admissible.

The plea of Babcock, in the present case, is, in substance, that he was not a holder of stock in the Chelsea Bank at the time of the dissolution of the charter, and it is accompanied by an answer in support of the plea. Several exceptions have been taken to the sufficiency of the plea and answer, some going to the form, and some to the substance. Without expressing any opinion upon the form, let us first look at the substance and merits.

If this were a pure, naked plea, unqualified in its terms, that this defendant was not a holder of stock in the Chelsea Bank at the time of its dissolution, it would undoubtedly be a good bar ; because no others are liable by the statute. It would be what a plea in equity is required to be, a decisive fact, answering the whole equity of the bill. But such plea must be made in precise and accurate language, in terms so plain and unequivocal that the fact may be put in issue, and so that if found true it must decide the case. But if the matter, as pleaded, may be found true, and yet the defendant be in any form liable, the plea is bad.

The plea of Babcock, that he was not a stockholder at the time, &c. without qualification, might have been a plea of that character ; but then he must have been taken to have averred that he was not a holder of stock, in any sense in which those words could be used ; and then, when traversed

and remitted to proof, if found to be a holder of stock, in any manner and under any circumstances, the issue must be found against him, and the plea held not proved.

But the defendant Babcock, in the present case, has not so pleaded ; but he relies on the ground that one who was the holder of shares as collateral security only, or as trustee for others, is not liable, within the true meaning and intent of the statute ; and he has so shaped his plea, supported by his answer, as to bring himself within that principle. If this position is not correct, then this plea is not good ; and the question upon the merits is, whether that principle is correct.

Upon this point, the court are of opinion that if a person was the holder of stock at the time of the dissolution of the charter, although he held the shares as collateral security, or as trustee for other persons, he was not on that account exempted from individual responsibility. The case is of one who, according to the usual and ordinary sense of the term, is a stockholder ; one whose name is entered on the books ; who holds a certificate ; and who is otherwise recognized by the corporation as a member, with the usual rights and powers incident to such character, as stockholder and corporator ; such as voting at meetings, serving as director, receiving dividends and making transfers; although he may be bound in conscience, or by contract, to account to other persons for the income, or for the shares themselves, in part or in whole. He has the entire proprietary interest, and may have a large beneficial interest. The party pledging or mortgaging may or may not redeem and regain the property ; it is at his option. Such a proprietary interest, therefore, so far as it affects the real property in the shares, may be ultimate and final in the holder. We think that it was the intention of the legislature, that the whole number of shares comprising the stock should contribute to the deficit of a fund in which the holders have a common interest, and in the profits of which, if it had proved profitable, they would have proportionably shared. No other view could have given this provision the semblance of an equitable assessment on the shares. It

46 *

presumed that the whole number of shares must be held by individuals, and therefore that either the trustee or the *cestui que trust,* the holder for security or the party pledging, should be liable under this provision.    The difficulties of charging the latter render it quite improbable that it was so intended by the legislature.

In case of trusts, the *cestuis que trust* may be minors, married women, strangers, persons *non compotes mentis,* or not in being.    In case of collateral security, the pledgor has no disposing or controlling power, cannot choose directors, cannot, by statute, be a director, cannot be said to have an interest in the stock ; but only a right, on certain terms, to acquire such an interest.

Several of the other defendants pleaded severally.    But all of them have, respectively, either not made any answer in support of the plea, or have by their answers admitted facts which show that they were holders of stock, but insisting that they held shares as collateral security only.    The pleas are therefore overruled.

The answers of several of the defendants were afterwards completed, and evidence was taken by them and by the plaintiffs.    It appeared that, at the time of the repeal of the charter of the bank, the bank itself, in its corporate capacity, owned 547 of the 1000 shares into which its stock was divided by the charter, and that, on the 30th of March 1843, only 164 of the shares were in the hands of holders who were solvent, and that 289 were in the hands of persons insolvent.

At March term 1843, the bill was taken *pro confesso* against those defendants who had not filed any answer ; and an argument was had upon the various questions which arose in the case as it then stood.

*Bartlett & Derby,* for the plaintiffs.    The provision in Rev. Sts. *c.* 36, § 31, that the holders of stock in a bank, when its charter expires, " shall be liable in their individual capacities for the payment and redemption of all bills which

may have been issued by said bank, and which shall remain unpaid, in proportion to the stock they may respectively hold at the dissolution of the charter," is a reënactment of the 14th of "the fundamental articles" of the State Bank, prescribed by *St.* 1811, *c.* 84, § 3, and which was also introduced into the charters of banks subsequently incorporated, and into *St.* 1828, *c.* 96, § 13.   The true construction of this provision is, that the stockholders are jointly liable for the amount of the unpaid bills, and that if any one is thereby made to pay more than his proportion of that amount, he is to have contribution from his co-defendants, under § 32 of *c.* 36, which provides for such contribution when any stockholder " shall have been obliged to pay any debt or demand against said bank out of his individual property." *Harris* v. *First Parish in Dorchester*, 23 Pick. 114.   The use, in § 31, of the words "in proportion to the stock they may respectively hold," does not limit the liability for " the payment and redemption of *all bills* which may have been issued," &c. but provides a rule, as between the parties themselves, for apportioning the joint liability imposed on them.   The different expressions in §§ 30 and 31 are noticeable.   In § 30, stockholders are made liable to pay any loss or deficiency caused by the official mismanagement of the directors, " provided that no stockholder shall be liable to pay a sum exceeding the amount of the stock actually held by such stockholder at that time."   In § 31, stockholders' liability is not limited by the amount of their stock ; but they are to pay " all bills " in proportion to the stock held by them.

  The course of legislation as to banks will assist in the construction of § 31, on which this bill is founded.   The first act which rendered stockholders personally liable was *St.* 1809, *c.* 71, which enacted that the president, directors and stockholders of Gloucester Bank should be "*jointly and sever- ally* liable in their respective persons and estates, as well as in their corporate capacity, to fulfil all contracts, and redeem all bills made and issued by the said corporation."   The next was *St.* 1811, *c.* 82, incorporating the Merchants' Bank in

Salem, which contained the provision, which was, on the next day, inserted in the act, incorporating the State Bank, and was reënacted by *St.* 1828, *c.* 96, and Rev. Sts. *c.* 36. This provision was probably first made in consequence of the failure of the Hillsborough Bank about that time, and seems to have been taken from the act incorporating that bank. See *Bond* v. *Appleton,* 8 Mass. 472. The object of this provision, when it was first enacted, and in Rev. Sts. *c.* 36, was to make the currency of the State as safe as was practicable ; and it is to receive a construction, so far as is consistent with its terms, which will best effect that object. This is to be effected by making the stockholders severally liable for the amount of the unpaid bills ; and it must be presumed that the legislature had a foresight of the insolvency of some of the stockholders, and did not intend that the bill holders should lose their claims while other stockholders should be able to pay them. In the case of *Gray* v. *Portland Bank,* 3 Mass. 378, the relation of stockholders to each other was held, in effect, to be that of partners.

It is to be considered that, when this liability of stockholders was first created, it contemplated the entire extinction of the corporation, before or contemporaneously with the liability created; there being, at that time, and until *St.* 1819, *c.* 43, was passed, no law for continuing the corporation in existence, for any purpose. The liability, therefore, was original and direct, not collateral or that of suretyship, because there was no principal who was liable. 2 Kent Com. (3d. ed.) 307. Hence, none of the rules which are applied to collateral liabilities and suretyship are applicable here. Nor are the rules applicable which are applied to contracts, express or implied, as to their binding parties jointly or severally. The legal relations implied by law, growing out of events that occur under contracts, will not aid in construing *statutes,* as to which the rule is, that whenever they impose a duty or burden upon a party who then has or has had an interest in a matter, that duty or burden is joint, unless the statute provides for a several liability. See *Hardyman* v. *Whitaker,* 2 East, 573, *note.*

The provision that stockholders should be liable to redeem unpaid bills, " in proportion to the stock they may respectively hold," was first introduced when there was no equity jurisdiction ; and it might well have been doubted, whether there existed a right to compel contribution by action at law, except in cases arising out of contract, as distinguished from duty or burden imposed by statute. It might further have been considered, that without the insertion of this provision, this statute duty might operate as a penalty, whenever the stock and assets of the bank should be lost or impaired by misfortune ; and therefore that an apportionment of penalties was to be provided for. There is a similar provision for the apportionment of penalties, which the common law does not provide for, in Rev. Sts. *c.* 44, § 22.

But if the construction of this provision, when introduced into *St.* 1811, *c.* 84, would have been, that it was a limitation of the liability of stockholders and a regulation of the right of contribution towards a joint burden, yet the *St.* of 1828, *c.* 96, § 14, and Rev. Sts. *c.* 36, § 32, by giving to a stockholder, " who shall have been obliged to pay any debt or demand against the bank out of his individual property," a bill in equity for contribution from the other stockholders, gave a legislative construction of that provision, at least for the future, if not for the past. There were, at the time when this provision was introduced, and there are now, only two cases in which a stockholder could be " obliged to pay " any sum, whether as a " debt or demand against the bank," or against himself, as a stockholder. These two cases were the obligation to replace capital stock lost by mismanagement of the directors, and to redeem unpaid bills. *Sts.* 1811, *c.* 84, § 3, and 1828, *c.* 96, §§ 12, 13. Rev. Sts. *c.* 36, §§ 30, 31. That the legislature, by the words " debt or demand against the bank," in § 32, intended no other than the two cases above mentioned, is shown by § 33, (taken from *St.* 1830, *c.* 58, § 3,) which provides that corporations, which are stockholders in a bank, shall be liable to pay any loss or deficiency of the capital stock, arising from the mis-

management of the directors of such bank, and also be liable
for the payment and redemption of its bills, which remain
unpaid, in the same manner as individual stockholders are
liable, and may compel a contribution from other stockhold-
ers, in the manner prescribed in § 32.    It is not to be
presumed that the legislature intended that the rights and
liabilities of corporate stockholders should be different from
those of individuals.    The meaning of the words " debts or
demands against the bank," being thus defined, excludes all
payments or contracts voluntarily assumed or made by any
stockholder for the bank.    The terms of § 33 seem so clearly
to embrace both § 30, and § 32, that it is not easy to show
that they were intended to be confined to § 30, as was suggest-
ed in 23 Pick. 114 ; but the words " debt or demand *against
the bank*" do not well express a claim *against stockholders*
to replace capital stock.

If the plaintiffs cannot charge the defendants jointly, and
leave them to adjust their proportions among themselves, they
claim to charge the solvent defendants, on their 164 shares,
with the payment of all the bills held by the plaintiffs, in
proportion to the amount of stock owned by each defendant.

*J. Pickering, Gardiner, B. Sumner, Choate, Blake &
F. C. Loring,* for the different defendants.    This bill cannot
be maintained against stockholders as parties to be charged.
1st. On technical grounds : Because, on the evidence, they
fail to prove any interest in the suit, as they were not bill
holders at the expiration of the charter, but have since ac-
quired the bills which they call upon the defendants to pay.
The claim against the stockholders, on Rev. Sts. *c.* 36, § 31, if
there be any, is not assignable ; nor capable, if assignable, of
being enforced in equity by the assignee ; nor, if capable of
being so enforced, is any assignment shown except by the
possession of some of the bills of the Chelsea Bank, payable to
bearer, the delivery of which cannot operate as an assignment
of the special statute claim against stockholders.    2 Story on
Eq. (3d. ed.) §§ 1040 *e,* 1048, 1049.    *Prosser* v. *Edmonds,*
1 Y. & Coll. 496.    *Vose* v. *Grant,* 15 Mass. 516.    And where
several plaintiffs, as joint representatives of a class, jointly pray

for discovery, account, or general relief, and some of them fail, on the evidence, to show any title or interest in the suit, it is a plain case of misjoinder of plaintiffs, incurable at this stage of the case, and fatal to the bill as a bill for relief. Story Eq. Pl. § 509.

2d. On the merits: Because the sole object of the provisions of Rev. Sts. *c.* 36, §§ 30, 31, (traced to their origin in the charter of the State Bank, and judged upon the phraseology there used, in connexion with the other parts of that charter,) was, to raise and secure, for the protection of the currency, a certain fixed capital stock, on which the issues of a bank were to be based, and which was to be used for banking purposes only, and always to be kept up, during the continuance of the charter, unless lost by pure accident and misfortune, and was, upon the natural expiration of the charter, to remain charged, in the hands of the several holders, as so many separate funds, parts of the former corporate fund, clothed with a trust for the redemption of outstanding bills. The object was not to make stockholders personally liable, otherwise than as holders of such funds, and to the extent of those funds, except in the case of loss by maladministration during the continuance of the charter. The object was to protect the currency against loss of capital by fraudulent agency, (almost the sole source of bank failures,) and not accidental insolvency, either of the bank or the corporators ; and no personal liability is created, except in the case of such loss, for which § 30 was framed, and in case of the distribution of the corporate fund, when fairly managed, for which § 31 was framed. As no part of the corporate fund of the Chelsea Bank is in the hands of the stockholders, no claim exists against them under § 31, and the bill fails, as a bill against them personally, upon its substantial merits. See *Bullard* v. *Bell*, 1 Mason, 243. *Wood* v. *Dummer*, 3 Mason, 308.

But if it should be held that the object of the statutes was to create a personal liability for payment of the bills of a bank, at all events, after the expiration of its charter, although

the whole corporate fund should have passed to the receiv-
ers and trustees appointed by the court, (as it has in this
case,) yet the plaintiffs are not entitled to a joint decree
and execution against the stockholders, who do not stand as
original promisors, but are, by the effect of § 31, mere guaran-
tors, at most, and sureties for the bank, in respect to the un-
paid bills.   This entitles them to a strict construction of a
statute which is in derogation of the common law ; and the
court, upon a proceeding in equity, is bound to administer the ·
law of statute liability, according to the principles of chancery
applied to sureties, (who are a favored class,) so far as is con-
sistent with the letter of the statute.   The statute expressly
makes stockholders sureties of the bank, but does not express-
ly make them sureties of each other ; and equity never
extends a mere legal liability, nor compels one man to pay the
debt of another, except by force of his own contract, express
or implied.   The peculiar doctrine of equity, which rejects
insolvents in contribution, and charges solvents for them, is
exclusively adapted to contribution *inter se,* where the ques-
tion arises between sureties, and is not a rule in favor of
creditors against sureties, except where sureties are responsible
at law, each for the whole debt.   And even between sureties
severally liable, but in different sums, for the same principal
debtor, the rate of contribution is measured, not by the num-
ber of solvent parties, but by the extent of their respective
engagements.   In case of implied engagements, arising out of
several and distinct interests, the legal liability is several and
not joint.   When, without contract, a liability is cast upon a
number of disconnected individuals, as an incident to the
ownership of certain property, and by mere operation of law,
that liability is joint or several, according as the property is
held jointly or in severalty.   1 Poth. on Obl. §§ 309, 420.
*United Ins. Co.* v. *Scott,* 1 Johns. 106, 116.   *Pratt* v. *Bacon,*
10 Pick. 123.   *Wood* v. *Leland,* 1 Met. 389.   *Anon.* 2 Eq. Cas.
Ab. 166, pl. 7.   *Craythorne* v. *Swinburne,* 14 Ves. 164.
*Deering* v. *Earl of Winchelsea,* 2 Bos. & Pul. 270.   4 Dane
Ab. 55.   *Hatch* v. *Brooks,* 2 Mass. 293.   *Doremus* v. *Selden,* 19

Johns. 213. *Ward* v. *Ward*, 15 Pick. 511. *Walker* v. *Webber*, 3 Fairf. 60. *Ernst* v. *Bartle*, 1 Johns. Cas. 319. *Ludlow* v. *McCrea*, 1 Wend. 228. *Penniman* v. *Briggs*, 1 Hopk. 300, and 8 Cow. 387.

Bank shares are recognized in law as distinct from the corporate fund, and are owned in severalty by disconnected owners. Any personal liability, therefore, which arises out of this ownership, by operation of law, must be presumed to be a several liability, unless that presumption is controlled by positive enactment. The enactment in Rev. Sts. *c.* 36, § 31, that stockholders shall be liable for the redemption of unpaid bills, "in proportion to the stock they respectively hold," not only does not control the implication of severalty, arising from the several ownership of the shares, but directly affirms it. These words of apparent limitation, in the very clause which creates the liability, constitute an essential part of the definition, and the liability is thereby defined as a proportionate liability. And this definition cannot be abrogated, controlled or modified, by any other part of the statute, which does not expressly and unequivocally point to that end. Sect. 32, providing a remedy in equity, by contribution, in favor of any stockholder "who may have been obliged to pay any debt or demand against said bank," cannot be held to repeal, by implication, the limitation in § 31, merely because the court cannot see the necessity for such subsequent provision, nor any case to which it would practically apply. The liability created by § 30, not being confined to bills, but extending to any debt or demand against said bank, which cannot be recovered of the corporation, in consequence of loss by "official mismanagement" of the corporate fund, is a case to which the remedy of § 32 is more applicable than that of the liability for bills alone, under § 31. If it be only equally applicable to § 30 and § 31, that is of itself sufficient to prevent a construction narrowing the limitation in § 31, so as in effect to expunge the words "in proportion to the stock they may respectively hold," and making them wholly inoperative where they stand. It is not necessarily

applicable either to § 30 or § 31; because it would cover the case of a stockholder who, by voluntary contract, to protect the credit of the bank, had guarantied a debt which, upon fail·ure of the bank, he had been "obliged to pay out of his individual property," and was unable to recover from the cor·porate fund.

The history of legislation on this subject, and a reference to the origin of the several provisions now standing in Rev. Sts. *c.* 36 — and which were intended, as appears by the commissioners' report, to be put into a consistent form, but not to alter substantially the former laws concerning banking corporations — show conclusively that the new remedy for contribution, provided in § 32, (first enacted by *St.* 1828, *c.* 96, § 14,) could not have been intended to explain, modify or alter, the preëxisting liabilities of §§ 30, 31, (first enacted by *St.* 1811, *c.* 84, § 3, art. 13, 14;) but that the provisions of § 32 were no part of the original definition of the liabilities of §§ 30, 31, which were created at a different time, and stood by themselves for seventeen years.

When the *St.* of 1811, *c.* 84, was passed, there was no equity jurisdiction in Massachusetts, except that conferred by *Sts.* 1785, *c.* 22, and 1811, *c.* 75, over the subjects of forfeiture on bonds and mortgages, and of real estate held in trust for counties. This fact shows that § 32 of *c.* 36 of the Rev. Sts. must have referred to the liability of § 30, rather than of § 31, if to either; because the former, being limited only by the amount of the stock, might in the event of recovery upon a special action of the case by a creditor, against a stockholder, for loss occasioned by official mismanagement, give cause for contribution, in equity, to such stockholder against others; whereas the liability of § 31, being in the first instance pro·portionate to the stock held by the individual sought to be charged, as compared with the stock held by all other persons, *viz.* the whole stock, no creditor could recover of any one stockholder, in an action at law, more than his proportion of the debt sued, and no cause for contribution could arise.

A reference to the provisions in the Hillsborough Bank act,

which are found in 8 Mass. 473, (and which became notorious about the time of the passing of *St.* 1811, *c.* 84,) and to the provisions of the temporary *St.* of 1809, *c.* 71, relating to Gloucester Bank, and a comparison of the language used in *St.* 1811, *c.* 84, show such marked differences in respect to personal liability, as could not but have been by design. And a comparison of §§ 30 and 31 of *c.* 36, with other parts of the Rev. Sts. and the original statutes reënacted therein, creating personal liabilities of stockholders in different kinds of corporations, and all provided for in one entire code, taking effect as a single statute, instead of tending to establish a construction of § 31 of *c.* 36, which would make bank stockholders jointly and severally liable for the whole issues of the bank, clearly indicates that the legislature must have intended the limits which they have apparently expressed, viz. an individual and several liability for unpaid bills, limited, in the first instance, by the proportion which the stock of the individual bears to the whole stock; and further limited, so that it shall, in no event, exceed the entire amount of his individual stock; thus leading, in every view, to the conclusion that this bill, if maintainable at all against stockholders personally, cannot entitle the plaintiffs to a joint decree against all, but only to a decree against each, for his own due proportion of all the bills.

The opinion of the court was delivered on the 6th of January 1844, by

SHAW, C. J. Our object at present is, to state the result of the opinion of the court in this case, upon various specific and important questions raised in the argument; in the belief that the decision of the court on these subjects may form the basis of a decretal order of reference to a master, which may speed a final decree in a cause already much protracted.

Some of these points affect the general liability of the respondents; and some of them turn upon the separate grounds of defence set up and relied upon by some of the respondents.

1. The first question is, assuming that the respondents are

responsible in proportion to their stock, how that proportion is to be computed in reference to the fact, that the whole number of shares into which the capital was divided by the charter had not been taken up, but, in fact, a considerable part of the stock was held by the Chelsea Bank itself, in its corporate capacity. The capital stock established by the charter, was $100·000, divided into shares of $100 each.

It is argued in behalf of the complainants, that as the shares were not all taken up when the bank commenced its operations, and during its continuance, each share of the stock held by an individual would represent, not merely a thousandth part of the whole capital, but also its proportion of the shares not taken up, and ought to be responsible in proportion. For instance ; if 700 shares only had been taken, then each share represented one seven hundredth part of the capital ; and as the bills were issued, in effect, for the account of those only who had taken shares, and as they would realize the profits of such issues in that proportion, they ought to be held liable in the same proportion for their redemption. There is certainly some plausibility in this argument ; and if this were a responsibility arising out of partnership, or other matter of contract, it would be entitled to great consideration. But this is a strict statute liability, and as it is created, so it must be limited and governed, by statute. It was perhaps an abuse of the charter, for the managers of this institution to proceed and put the bank into operation, and especially to issue bills, before the whole 1000 shares were taken up, and the whole $100,000 paid in, as the fund bound by law and appropriated to the redemption of their bills. But this cannot enlarge the liability of the holders of shares, who, although participating in a stock which is to be used jointly, are yet several holders of their respective shares. And upon this point the court are of opinion, that notwithstanding the fact that the Chelsea Bank was, to a considerable extent, owner of its own stock, yet that the several liability of the individual stockholders is not thereby increased. The statute (Rev. Sts. *c.* 36, § 31) charges the stockholders with this liability, " in proportion to the stock

which they may respectively hold ; " and as each bank char-
ter that is granted declares what shall be the whole amount
of its capital stock, and into what number of shares or parts
it shall be divided, that proportion must be ascertained by
considering what number of shares or parts of the whole capi-
tal each one so holds. Any other construction would leave
the rule doubtful and uncertain, and might cause the propor-
tion to vary with particular negotiations of the bank, by
which it might, lawfully or otherwise, take a transfer, for a
limited time or special purpose, of its own shares. We do not
lay much stress on the argument that each stockholder, being
a holder in severalty of the number of shares taken by him,
and having no means of knowing how or by whom the other
shares are holden, and the general management of the con-
cerns of the bank being by law placed in a board of directors,
and its transactions in detail not being presumed to be known
to the several stockholders, the construction contended foi
might render a stockholder liable to a greater extent than he
had any reason to suppose when he took a limited number of
shares or parts in the capital. It cannot have much weight,
because the liability does not result directly from the act or
contract of the party, though it is indirectly by his act in
taking shares that he becomes liable ; but it is entitled to
some consideration, in determining the intent of the legislature
in framing a system for a great branch of public administra-
tion, and a system of regulations which should secure the
public from loss, without exposing particular shareholders to
unlimited or unforeseen liabilities. We think, therefore,
that no stockholder can be responsible beyond the proportion
which the number of shares held by him bears to 1000, the
whole number into which the capital was divided by the
charter.

2. Another and very important question is, for what amount,
and upon what principle the several defendants, who were
stockholders at the time that the charter of the bank expired,
shall be held responsible.

We are of opinion, in the first place, that those of the

defendants who are responsible are not jointly responsible, and cannot by any form of judgment be made liable for each other. Ordinarily, when persons are jointly liable, it is because, as between them and the creditors, each is liable, *in solido*, for the whole amount. There is, therefore, no injustice in requiring either of them to pay the whole amount, leaving him to obtain redress among his co-debtors, as he can. But, in the present case, the liability is created by statute, and is in its nature several. The property in respect to which the liability is created, namely, the shares in the bank, is separate property. So far as the stockholder is owner, he is sole owner. Again; the statute declares that holders of stock " shall be liable, in their individual capacities," for the payment and redemption of all unpaid bills, " in proportion to the stock they may *respectively* hold at the dissolution of the charter." The term " respectively," indicating the different proportions in which they may hold, indicates also the different proportions for which they may be holden, and as clearly indicates a several liability.

It follows as a necessary consequence from this view, that no stockholder, who was such at the time of the expiration of the charter, can be responsible beyond a sum equal to the nominal par value of his stock at the time of such expiration, that is, beyond the amount of $100 for each share so held, although the aggregate amount of the liability of the parties so chargeable should be insufficient to satisfy the whole amount of the claims of bill holders.

Suppose many such stockholders are not within the jurisdiction of the court, and therefore cannot be reached by its process, nor affected by its judgment; it is the ordinary misfortune of a creditor who has a valid demand, but whose debtor is not within reach of process. It cannot enlarge or alter the liability of another party, who, to a limited extent, is responsible for the same debt.

Again; supposing some of those, who are liable and who are within the jurisdiction of the court and may be bound by the judgment, should be insolvent, or be discharged under pro-

ceedings in bankruptcy; it affords no reason why those, who are liable and solvent, should pay more than they otherwise would. Those who are solvent do not stand in the relation either of joint debtors, or sureties or guarantors for the insolvent. A case may be imagined, in which a certain burden should be thrown upon a number, all equally liable, when one paying the whole, or more than his just proportion, would have contribution from others; and in that case it might be held in equity, that the burden should be placed, by a just contribution, upon those who are both liable and able to bear it. This would be upon the ground that all are liable, and that neither can obtain any satisfaction from the insolvent co-obligor. The debt is therefore, practically, a burden upon the solvent debtors, and he who pays it relieves his solvent co-debtor *pro tanto.* But of this it is not necessary to express an opinion. The stockholders, according to the view we take of the statute, are not liable to a common burden, but only each severally for the amount charged upon him by the statute, and are not therefore within the principle. The creditors, having but a limited claim upon those who are liable, cannot throw on them the loss arising from the insolvency of others. It is the common case of a creditor who has a valid demand against a debtor unable to pay him; it is his own loss.

The strongest argument in favor of the position that stockholders are in the first instance liable to the bill holders for the whole, and that it is for them to look to the other stockholders for contribution and reimbursement, is drawn from § 32 of the Rev. Sts. c. 36, which provides that " any stockholder of a bank, who shall have been obliged to pay any debt of the bank out of his individual property, shall have a bill in equity," for contribution from the other stockholders, who may be liable for the same. This provision certainly carries an implication that the legislature looked to some case, in which a stockholder should be liable to pay to a creditor more than the proportional part for which he is ultimately liable; because, he could otherwise have no claim for contri-

bution. In the first place, this declares a general principle of equity, which probably would apply to every such case, if any should arise, without an express enactment. But it does not necessarily apply to the individual liability created by § 31, because there are other cases of individual liability of stockholders, to which it may apply and have its effect. Such a one is created by § 30, where individual stockholders are held iable for the mismanagement of directors; and this liability is not confined to each one's proportion of the deficit, but is limited only by the amount of the stock held by him. Such a one, we think, cannot control the express terms of the section creating the individual liability, and limiting it to such a proportion of the deficit as the amount of the stock, held by the person to be charged, bears to the whole number of shares. The court are therefore of opinion, that the respective respondents are severally liable to the amount not exceeding the number of shares held by them respectively, at $100 purchase; to the whole amount, if necessary to satisfy the amount of outstanding bills; otherwise, to an amount sufficient to redeem and pay all such unpaid bills; but that they are not liable for a greater sum, although the aggregate of all such liabilities should prove insufficient to pay the whole amount of such bills.

3. The third question, argued as a separate and distinct question, and one of considerable importance, is, whether this remedy is confined to those who were holders of the bills at the time when the bank charter expired by the repeal of the act of incorporation; or, to state the question somewhat more precisely, whether it is necessary for the complainants, in order to maintain this suit, to prove affirmatively that they were holders of the same bills, in respect to which they now claim as creditors in this suit, when the charter expired. Upon this question, the court are of opinion that the remedy is not confined to those who were holders at the time of such repeal, and that it is not necessary for the complainants respectively to give proof of that fact; but that when any person, after such repeal, took such bills in the ordinary course of business,

or otherwise acquired a good title to the same, such bills are bills remaining unpaid, within the provision of the statute giving this remedy; and that the holders of them have a right to come in and claim as creditors; and that, in such a suit, the possession and production of the bills furnish *primâ facie* evidence of such title.

We are first to consider what is the nature of a bank note, the purposes which it is intended to subserve, and the objects of the legislature, in providing, for its payment and redemption, this extraordinary security. It is indeed a contract, a legal obligation, entered into by a bank; but it is in the nature of a bill of credit, intended to pass in the freest manner from one to another, as current money, and, for the time being, to subserve the purposes of money. For this purpose, it was made transferable by delivery, was issued and reissued by the bank, without regard to its date or to the fact of its having been once or more times paid; and the holder is under no necessity of giving any other evidence of title than possession. Again; the legal character of bank notes is not necessarily changed at the moment the act of incorporation is repealed. This, for many purposes, is regarded as the expiration of the charter; still, by one provision of law, Rev. Sts. *c.* 44, § 7, the corporation is continued for many purposes, for three years longer. The same chapter provides a fund for the redemption of bills which may remain unpaid in due course, and no doubt it was contemplated by the legislature to be a fund ample for the purposes for which it was appropriated. For three years, a bank does not necessarily lose all its credit, when its charter thus terminates, and its existence partially ceases. Then why should its bills not continue to circulate as before, and why should not those who receive them have, as before, all the rights of *bonâ fide* holders? Or suppose their credit is in some degree impaired: why should not a holder be permitted to transfer them, according to their original character and purpose, at the best price he can obtain for them, exercising his own judgment and his own right, to hold them himself, or to confer on another the full rights of a *bonâ fide* holder?

It seems to us, that this construction of the law is best calculated to carry into effect the purposes of the legislature, and not inconsistent with their provisions.  The object was to provide a fund for the redemption of the bills.  It must have been contemplated that these bills would be widely scattered, and many of them held in small amounts, or in single bills of one or more dollars.  It would be attended with great inconvenience, if every holder of a single bill should be obliged to come in as a creditor, or otherwise lose the benefit of the provision intended for his benefit; and this inconvenience is so considerable, that we think it could not have been contemplated by the legislature.

But we think the provisions of the statute are in conformity with what we should have expected.  It is not a provision that the holders of bills at the time of the dissolution shall be entitled to claim, but that the holders of the stock shall be liable for the payment and redemption of all unpaid bills.  Of course payment is to be made to those who are the lawful holders of the bills ; and as the statute does not fix the time of the expiration of the charter as the time when the right accrues, it may be held to apply to any time at which payment of such bills is legally demandable ; and of course payment must be made to those who are *then* the legal holders.

It was argued, that although the bills were negotiable, yet the statute liability, when once fixed, is personal to the then holder, and cannot pass to any other person by the transfer of the bills.  But we cannot feel the force of this argument.  If the statute had provided, that the persons then holding the bills should be entitled to claim, &c. there would have been more force in it.  But the same power which could create this liability could as easily annex it to the bill, and make it pass, with the bill, to any one who should become holder ; and this we think is precisely what the statute has done.  We are therefore of opinion, that in regard to all those, who were originally parties complainant in this suit, and who have produced Chelsea Bank bills, they will be presumed, in the absence of proof to the contrary, to have held such bills, so as to entitle

them to commence the suit, at the time it was commenced; and in regard to all those who may come in before the master, to prove their claims, the bills produced by them will be presumed to be held by a legal title, and will enable them, in the absence of proof to the contrary, to maintain their claims to the amount of the bills so produced.

On the 20th of May 1844, a decretal order was passed by the court, which, after a recital of the facts and proceedings in the case, concluded as follows:

"Forasmuch as it appears to the court, that there is certain property and estate which was attached, on original process, as the property of said corporation," (the bank,) "in this suit; and that there is certain other property of the same corporation in the hands of receivers; and that the plaintiffs have a just claim for such sum as shall, in the aggregate, be ascertained to be due to such holders of bank bills of the said bank, made and issued by said corporation, who shall come in and become parties to this suit, and prove their demands; and that the property and estate of the said corporation, so far as the same may be available, ought in the first place to be applied towards the payment and satisfaction thereof: And forasmuch as it appears to the court, from the admission of the parties, that the property and estate of the said corporation, available for the purpose aforesaid, will be insufficient to satisfy such aggregate sum as will be found due to all such holders of unpaid bills of said bank, as aforesaid; the court doth further declare that the said defendants, stockholders, and their representatives, individually, are liable for the payment and redemption of all the bank bills of the said bank, which have been made and issued by said corporation, and which shall remain unredeemed and unpaid from the avails of such estate and property of the said corporation, as aforesaid, or otherwise, according to the provisions of the 36th chapter of the revised statutes of this Commonwealth. And the court doth order, that it be referred to George S. Hillard, Esq. one of the masters of this court, to inquire and take account of what

is due to the plaintiffs, and all other holders of unpaid and unredeemed bills of the said corporation. And the said master is to cause an advertisement to be published in" (certain newspapers mentioned,) "for the holders of unpaid and un-redeemed bank bills of the said bank to come in before him and prove their demands; and he is to fix a peremptory day for that purpose ; and in default of their coming in to prove their demands, by the time so to be appointed, they are all to be excluded the benefit of this decree, or other decree to be made herein. But the persons, so coming in to prove their demands, not parties to this suit, are, before they are to be admitted as bill holders, and by reason thereof creditors, to contribute to the plaintiffs their proportion of the expense of this suit, to be settled by the master. And that the said master do inquire and state what property was attached, as aforesaid, the nature, condition and value thereof, and whether the same be now holden by virtue of said attachments, so that the same may be available, and how far, towards satisfying the said claims of those who are or may become parties to this suit. And that the said master do also inquire and state what property of the said corporation is in the hands of the said receivers, and the nature, condition and value thereof, and how far the same may be available towards the satisfaction of said claims. And that the said master do also take an account of the nom-inal amount of the capital stock of the said corporation at the time of the dissolution of its charter, and the nominal amount of the stock at that time held by the defendants respectively, in the said corporation, individually and as co-partners. And for the better taking of said accounts, and discovery of the matters aforesaid, the parties are to produce before, and leave with the master, all deeds, books, papers and writings in their custody or power, relating thereto, and are to be exam-ined as the said master shall require. And the said master is to make his report, touching the matters hereby referred to him, with all convenient despatch. And the said master is to be at liberty to state any special circumstances, and to make a separate report, as to any of the matters aforesaid. And

the court doth reserve the consideration of all further directions, and of the costs of this suit, until the coming in of the master's report."

The master made a report, conformably to the foregoing order, in which he stated (among other things) the amount, &c. of the assets of the bank, in the hands of the receivers ; that certain real estate, which had been mortgaged to the bank, was attached by some of the plaintiffs, on the bills (inserted in writs) which originally were filed by them, severally, against the defendants ; that certain post notes, issued by the bank, were presented to him for proof, by the holders thereof ; and that certain of the defendants were insolvent, and had been discharged from their debts, under the bankrupt law of the United States, or the insolvent laws of this Commonwealth.

Upon the coming in of this report, the plaintiffs filed the following motion :  " That the minutes of the interlocutory decree or order heretofore made, and upon which the master's report was founded, be so far varied as, 1st, to strike therefrom such part thereof as required the master to report the situation and value of the assets of said bank, in the hands of the receivers, and also such parts of said deeree as refer to said assets.   2d. That said report be recommitted to said master, with instructions to sell and dispose of, by public auction, all the interest of said bank in and to any estate held by it iu mortgage at the time of the attachment thereof in the plaintiffs' said suit, and that the receivers of said bank " (who were defendants in this suit) " join in a conveyance thereof to the purchasers.   3d. That the master further ascertain and report to the court which, if any, of the defendants, stockholders in said bank at the time of the repeal of its charter, have since become and are now insolvent, and the number of shares in said bank by them respectively held at the time of said repeal.   4th. And that, thereupon, said master report to the court the sum that will be due to the plaintiffs and all other holders of bills in said bank, who shall have proved their claims, with interest thereon from the time of demand of payment of said bills from said bank, first de-

ducting therefrom the proceeds of the sales of said mortgaged premises ; and that the said master state an account, in which the amount, thus found due to said plaintiffs and other holders of bills, shall be apportioned, charged to and among such of the defendants as shall be found by him to be solvent, in proportion to the number of shares held by them respectively ; provided the same do not exceed in amount the par value of said shares."

The defendants filed the following motion : " 1st. That so much of the master's report as relates to post notes and the allowance thereof be stricken out, and that the master be directed not to allow the same as part of the bills of the bank remaining unpaid, for which stockholders are individually liable. 2d. That the master be instructed not to add interest to the amount of the bills, in ascertaining the total amount of liability to be apportioned among the parties liable."

These motions were argued on the 11th of June 1844, by *Fletcher & Bartlett,* for the plaintiffs, and by *Gardiner, Choate & F. C. Loring,* for the defendants.

The opinion of the court was made known on the 11th of September 1844, by

SHAW, C. J. 1. The court are of opinion, that the attachments of real estate mortgaged to the bank, which were made at the commencement of some of the suits that were at first brought by these plaintiffs severally, were wholly unavailing, and cannot be taken notice of in this suit, if otherwise they could have been. Several distinct grounds were stated, at the argument, why these attachments cannot now be relied on as affecting this suit, on each of which, in our opinion, the ground is well sustained. One of the most obvious and decisive objections is, that this is a suit against individual stockholders, on a special statute provision ; that no decree or judgment for satisfaction of the plaintiffs' demand could have been obtained against the bank, and of course their property, were it well attached, could not have been taken

2. The court are of opinion, that the post notes, set forth in the report, issued by the bank, payable on time, and with interest, are not bank bills, for the payment and redemption of which holders of stock are liable in their individual capacities, under Rev. Sts. *c.* 36, § 31.

3. The other material question, arising on the motion to vary the decretal order, turned on the point, whether the holders of bills can have a decree for payment to be made by the stockholders, before the assets of the bank have first been applied. Without declaring the final decree of the court, we think that the court ought not to vary the former order upon this subject, and that the amount of the assets should be reported. The question of application would be still open.

But further; this is an extraordinary remedy afforded to the holders of bills which shall have been issued by a bank, when its charter shall expire, and which shall remain unpaid. When shall the charter be said to expire? Shall it be on the day of the repeal? In some respects it is so. But the bank may then have ample funds, and even cash enough to pay all its bills, together with all other debts. The law also allows three years to wind up, that is, to collect the assets in cash, and call in and pay its bills. Shall the individual stockholders be charged, when the bank is ready and willing to pay? This would be unreasonable. Shall they be charged when there are assets in the hands of officers of the law, which assets are the first and natural fund applicable to the payment of such notes, and when, for aught that appears, such assets constitute a fund sufficient for their payment? May not the terms " shall remain unpaid " be fairly construed to mean *ultimately unpaid,* after the application of the proper funds?

But without going further into the question, it seems to us proper that it should appear to the court what amount of assets there is in the hands of the receivers, what they consist of, &c. in order to decide whether any and what order be taken

in regard to them, before a final decree is entered against the individual stockholders.

4. The court are of opinion that there is no ground upon which interest can be allowed to the bill holders. The liability of the defendants depended upon a new and peculiar statute provision, intended the better to secure the payment of bills at par, but which did not provide for the payment with interest. The proportion which each was to pay could be ascertained only by the result of this suit in equity. But if that difficulty could have been surmounted, there was still a greater one lying in the way, which was, that whatever was due from any stockholder was due, in various proportions, to all the holders of bills. It was impossible, therefore, to pay or tender payment, and the defendants were in no default.

5. The court are of opinion that the amount for which the solvent stockholders are liable is not affected by the insolvency of other stockholders; but that each solvent stockholder is liable only according to his own proportion of the stock held by him when the charter of the bank was repealed.

At March term 1845, the master made his second report, stating the amount of the unpaid bills that had been proved before him, (deducting a payment of ten per cent. made by the receivers from the assets of the bank,) the names of the holders of stock when the charter of the bank expired, and the number of shares held by each; and a final decree was afterwards passed, by which said holders were charged with their several proportions of said amount, according to the number of shares of stock so held by them. And it was decreed, that if the said defendants should fail to pay the costs, an execution might issue against them all jointly.